# Exhibit A

1      IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                       -   -   -
  KATHLEEN EASTMAN, et al. :
3                 Plaintiffs  :
                             :
4                 vs.        :
                             :
5   THE CITY OF PHILADELPHIA :
                  Defendant  : No. 21-2248 (MSG)
6
                      -   -   -
7

              Thursday, November 3, 2022
8
                      -   -   -
9

10      Virtual Deposition of KATHLEEN

11  EASTMAN, taken pursuant to notice, held at

12  the Offices of Kohn, Swift & Graf, P.C.,

13  1600 Market Street, Suite 2500, Philadelphia,

14  Pennsylvania, commencing at 1:00 p.m. before

15  Michelle A. Landman, Professional Reporter

16  and Notary Public; in and for the

17  Commonwealth of Pennsylvania.

18

19

20

21          STREHLOW & ASSOCIATES, INC.
              54 FRIENDS LANE, SUITE 116
22         NEWTOWN, PENNSYLVANIA  18940
                  (215) 504-4622
23          SERVING NJ, PA, NY & DE

24

Page 7

1  multiple people are talking on the record so
2  I'm going to ask you to let me finish
3  questions completely and I'll let you answer
4  completely.  If for any reason I would
5  interrupt, please just let me know.  I will
6  give you as much time as you want.
7          If you cannot hear a question because
8  of any kind of audio issues, computer issues,
9  whatever, just ask me to repeat.  If you
10 don't understand a question, I can be
11 imprecise at times, please just ask me to
12 rephrase.  But if you answer a question, I'm
13 going to assume that you both heard it and
14 understood it; is that fair?
15 A.     Yes.
16 Q.     Okay.  This shouldn't go on for too
17 long, but if you do need a break, just let us
18 know.  I will ask that you answer whatever
19 question was currently pending at that time
20 and then we can go on a break.
21 A.     That's good.
22 Q.     So just to start off, how long had you
23 had a driver's license?
24 A.     Oh, 45, 50 years.

Page 8

1  Q.     I actually forgot one more
2  instruction, if you are going to -- I'm going
3  to ask you not to guess, but if you are going
4  to approximate, just let us know.  That's a
5  perfect example, it does not have to be
6  precise.
7  A.     Okay.  I'm 75, I think I got it when I
8  was 21 or 22, I was a lot older than my
9  friends at the time.  But I think that's
10 accurate.
11 Q.     Have you been involved in any car
12 accidents?
13 A.     Oh, yes.  Driving for so long, yes.
14 Q.     Okay.  Have you been involved in any
15 in the last, let's say, five years?
16 A.     No, I have not.
17 Q.     How many parking violations have you
18 had?
19 A.     Probably the most I have ever had are
20 in the City of Philadelphia, I don't know how
21 many.  But I think that is the only place,
22 even when I lived in the suburbs, I think I
23 have gotten a ticket in the City of
24 Philadelphia, yes.

Page 9

1  Q.     How long have you lived in the City of
2  Philadelphia?
3  A.     Well, I was born in the City, in
4  Kensington, and left when I got married.  And
5  I came back to the City to live six years ago
6  -- oh, I'm sorry, I also lived in the
7  Fishtown section of the City for about two
8  years in the '90's while I was separated from
9  my husband.  And then last time I came back
10 was six years, within the City limits, yes.
11 Q.     Okay.  And what neighborhood do you
12 live in currently?
13 A.     Old City.
14 Q.     Is this the same neighborhood that
15 you've lived in the entire six years?
16 A.     Yes, it is.
17 Q.     Okay.  Have you stayed in the same
18 address the whole time?
19 A.     Over the last six years?
20 Q.     Yes.
21 A.     Yes.
22 Q.     Okay.  What address is that?
23 A.     122 Church Street, Unit 104.  It's a
24 condo.

Page 10

1  Q.     Okay.  What is parking like in that
2  area?
3          MS. MANOHAR:  Object to the
4      form.  You can answer.
5          THE WITNESS:  Okay.  I tell
6      everyone it's my nemesis.  Parking
7      is difficult and you live your life
8      around that if you have to move
9      your car.  That's how I would
10     describe it.
11         But recently I have been given
12     parking -- allowed to park at my
13     work parking lot in off hours.  So
14     I have that to fall back on over
15     the last two years, since COVID,
16     which makes it easier for me.
17 BY MS. REINHART:
18 Q.     Where do you work?
19 A.     I currently work at -- do you want to
20 know the name of the company?
21 Q.     Sure.
22 A.     Or the location?
23         It's called the American Bible
24 Society, it's a nonprofit.  It's located at

Page 11

1  Fourth and Market.  I had left my prior
2  employment and was offered -- I saw an ad for
3  part-time work, so I work for them since
4  April of 2019.
5  Q.    Okay.  So circling back to the
6  description that you gave of parking in your
7  area.  You said -- and I don't mean to
8  mischaracterize it, but you described it
9  generally as difficult.  Can you elaborate on
10 what factors make it difficult?
11 A.    There are just so many people who have
12 cars that are trying to park in the Zone 10
13 where I live, specifically in the area like
14 from Front to Arch, I'll just say that block
15 area, and Front to Second.  And the reason is
16 is that in order to have residential parking,
17 the City will grant residential parking if
18 there are only less than, what, 10 percent,
19 I'm not sure the amount of businesses located
20 in the area.  So, you know, Second Street
21 where there are restaurants and things of
22 that sort, there isn't residential parking.
23 So even though there may be condos above
24 those businesses, there is still not parking

Page 12

1  there.  It's only limited to blocks that are
2  mostly residential.
3       Does that make sense what I'm saying?
4  Q.    I'm just going to ask a couple
5  clarifying questions.  You said residential
6  parking a few times.  What do you mean by
7  that exactly?
8  A.    Well, the City will grant Residential
9  Parking Permits to residents of the City in
10 areas where they live.  And so in my area of
11 Old City, it is a Zone 10 parking.  So you
12 are allowed to park on certain streets,
13 certain sides of streets because -- so the
14 parking is given to residents for free if
15 they purchase a parking permit annually.  And
16 there are meters there, but the parking
17 permit allows those residents to park without
18 paying a meter fee.
19      So it means that we are competing with
20 someone that may be coming into the
21 neighborhood and park in those spaces and pay
22 a metered -- an amount for the metered
23 parking, two or three hours, and the
24 residents are not limited to the parking

Page 13

1  meters.  We don't have to put money in the
2  meter, we can park there all day, overnight
3  if necessary, yes.
4  Q.    Okay.  So just to make sure that I
5  understand.  You're saying that there are a
6  lot of businesses in the area?  Just to start
7  out.
8  A.    Yes.  Yes.  It's Old City, we are
9  competing with restaurants, we are competing
10 with the Arden Theatre.  We are competing
11 with buses that are bringing tourists into
12 the area, that's it.  So you're very
13 cognizant, at least I am very cognizant, or
14 if anybody does get a resident permit and
15 moves into the area, they become very
16 cognizant of, you know, what it means to have
17 -- to get a parking space in that area, so
18 yes.
19      Does that answer it again?  I hope so.
20 Q.    It does, yes.  Thank you.
21 A.    Okay.
22 Q.    So before you were parking at the
23 American Bible Society's parking lot, it
24 sounds like you regularly parked in this

Page 14

1  area?
2  A.    I regularly park in the street.  The
3  only time I go to my employer is when -- for
4  safety reasons right now, like if I were to
5  come home after 8:30 or 9:00, I would circle
6  the block to see if there was anything
7  available.  And if not, then I would just go
8  to my parking garage and park there and take
9  the bus back to my home.
10 Q.    Okay.  Let me clarify the timeline
11 real quick.  You said you started working at
12 the American Bible Society approximately
13 April 2019?
14 A.    Correct.
15 Q.    And that you have been able for the
16 last two years to park in their parking lot;
17 is that correct?
18 A.    I think for the last six months.  And
19 it has to do with when I work there, I'm just
20 a part-time person.  Once COVID came,
21 everyone was working from home and the
22 facility manager said -- I asked him, if I
23 was stuck, if I could ever park in the work
24 parking lot, and he said yes I'll give you a

Page 19

1  I know what times are the best for me to go
2  and come back and be able to park on the
3  street.  That's not always -- that doesn't
4  always happen.
5         In the past before my employer allowed
6  me to come there, I would park and every half
7  hour move my car because it was in a towing
8  zone or something, it was not a way to live.
9  Q.    Okay.  That's not what I asked.
10 A.    Okay.
11 Q.    What I'm asking is, when you go to
12 park your car, generally speaking, what time
13 of day is that?  I can expand on other
14 questions after that.  I just need to know
15 what time you're typically trying --
16 A.    I don't leave my house the same time
17 everyday to do certain things.  I live a
18 pretty normal life, I'm not limiting my life
19 by the parking.  I don't like it, but I
20 follow the rules.  And if I need to do
21 something that is -- that I'll be out later
22 or something, then I need to make sure that I
23 have it all setup, that's all.
24        You know, when I park at Fourth and

Page 20

1  Market, I still have to walk home.  So again,
2  I'm trying to make sure that I get my car
3  parked where I won't get it ticketed, or that
4  I'm not paying $20 to park it for a few
5  hours.  Remember also the parking in the
6  city, especially in Old City is expensive.
7  Q.    So just as a matter of habit, is it
8  fair to say that you do not drive your car
9  everyday?
10 A.    That is correct.
11 Q.    How often do you drive your car,
12 approximately?
13 A.    That depends on what is happening.  I
14 would say every weekend I'm doing things.
15 During the week, if I can take public
16 transportation across the city, I would do
17 that.  If it's a friend that is doing
18 something and invites me -- for instance,
19 there is something in November and we are --
20 friends are getting together, I will go, it's
21 in the evening.  I'm not going to not do
22 something socially because of the parking.
23        So my children might say to me, I
24 think you need to get rid of your car.  And

Page 21

1  I'd say no, I'm not, you know, maybe you need
2  to get rid of your car too.  So you do it
3  first and then I'll do it.
4  Q.    Okay.  Is PPA active in your area?
5  A.    Very, yes.
6  Q.    On what blocks?
7  A.    Every block I have seen them.  I don't
8  know what the schedule is.  But there is bars
9  on Second Street, there is all kinds of
10 activity, you know, people are all over in
11 town, there are all kinds of things
12 constantly.  You will see the officers and
13 you will also see the trucks towing vehicles
14 down to the lots, yeah.  Very active.
15 Q.    How often do you see cars being towed
16 in your neighborhood?
17 A.    Goodness, I'm not looking out my
18 window for all that all the time, no.  I'm
19 just cognizant of it.  And that PPA will
20 ticket cars.  It's not a friendly city for a
21 tourist or anyone else to come.
22        So I know friends that have come to
23 visit me and have gotten tickets, you know.
24 I don't know what to say about that.  I don't

Page 22

1  know the number.  I know that it's part of my
2  life down here, yes.
3  Q.    When you tried to park your car, how
4  long do you typically spend looking for a
5  parking space?
6  A.    Right now, it's probably maybe 20
7  minutes at the most.  Twenty minutes to a
8  half an hour.
9         Prior to the back up from my
10 employer's lot, I would spend hours.  I would
11 wake up because some parking that the city
12 will allow is, they will allow it on the
13 north side of Arch Street from 8 p.m. to 8:00
14 in the morning, so I would park there if it
15 was available after 8 p.m. and, you know,
16 make sure my alarm was set so that I would be
17 up at 7:30.  And if nothing was available,
18 I'd keep moving my car from parking -- from
19 loading zones every half hour.  It was awful,
20 but I remember those times.
21 Q.    Again, all of my questions for the
22 next foreseeable bit are going to be just
23 about before you had the ability to park at
24 your employer's parking lot.

Page 27

```
 1        son lives in Northern Liberties.
 2 BY MS. REINHART:
 3 Q.     Okay.  I am going to ask you really
 4 carefully to listen to my questions that I'm
 5 asking.  Just now I asked what neighborhood
 6 you are currently in.  So I can follow-up
 7 with additional questions after that because
 8 a lot of times things build on each other.
 9 But I am going to ask you really carefully to
10 listen to the questions that I am asking.
11 A.     I thought I was Shelly, I apologize.
12 Q.     That's fine.  Depositions are
13 stressful and I hear that.  So I'm just
14 asking you just to listen carefully.
15        And can you answer what neighborhood
16 you are currently in?
17           MS. MANOHAR:  I'm going to
18           object.  She did answer that
19           question previously, I believe more
20           than once.  But you can answer.
21           THE WITNESS:  Yeah, in Old
22           City.
23 BY MS. REINHART:
24 Q.     Okay.  So how long have you owned your
```

Page 28

```
 1 vehicle?
 2 A.     My current vehicle?
 3 Q.     Yes.
 4 A.     I'm trying to think, maybe ten years.
 5 Q.     What is the make and model of the car?
 6 A.     It's a Volkswagen Beetle, 2008.
 7 Q.     Is it insured?
 8 A.     Yes.
 9 Q.     By who?
10 A.     Erie Insurance.
11 Q.     When do you typically register your
12 vehicle every year?
13 A.     I believe the current registration is
14 for two years, and I believe it is in August.
15 But I think Pennsylvania just initiated a new
16 law where it would be for two years.
17        I get it inspected every year, so
18 again regularly.
19 Q.     Do you have any unpaid parking
20 tickets?
21 A.     No, not that I am cognizant of.
22 Q.     So earlier you mentioned that -- we're
23 just taking a step back.
24        We're here today because at some point
```

Page 29

```
 1 in time your vehicle was towed; is that
 2 correct?
 3 A.     Yes.
 4 Q.     Can you tell me about when that was?
 5 A.     Yes.  It was Veteran's Day, the Monday
 6 that it's celebrated.  Veteran's Day which is
 7 usually around the 9th or 10th, and it was
 8 November 9th of that year, I think it was
 9 2019.
10        And I had taken my car to the car wash
11 on Delaware Avenue, and I came back and
12 parked my car on the south side of Arch
13 Street in the 100-block and it was towards --
14 on Arch Street towards Front Street, goes
15 from Front to Second Street and I parked
16 closer to Front Street, and I'm guessing it
17 was around 1:00 or 2:00 in the afternoon.
18 And I spent some time cleaning the windows,
19 because I had just got the car washed, and
20 also just kind of straightening up inside the
21 car and taking out any kind of trash that I
22 could find on the inside.
23 Q.     Do you recall approximately how long
24 you spent doing that?
```

Page 30

```
 1 A.     I think 20, half hour.
 2 Q.     So what time, approximately, would you
 3 have walked away from the vehicle then?
 4 A.     Well, I remember that it was bright
 5 sunshine, I don't know, maybe 2:30, 3:00 at
 6 the latest.  I'm not sure of the exact time.
 7 Q.     When did you come back to your car?
 8 A.     I came back the following Saturday in
 9 the middle of the afternoon.  I was meeting a
10 friend over in New Jersey and I was probably
11 going to go and do some grocery shopping
12 while I was over there.  So, yes, I'm going
13 to say, I'm not quite sure of the exact time,
14 but early afternoon, mid-afternoon, 2:00 at
15 the latest.
16 Q.     So walk me through what happened
17 exactly.  You walk up to where you believe
18 you parked your car.  You didn't find it.
19 And then what?
20 A.     You mean, on Saturday when I noticed
21 the car wasn't there?  I had known from once
22 earlier, maybe two years prior to that, my
23 car had been towed from Church Street and I
24 had learned that it was -- that you should
```

Page 31

1  call the Sixth District Police and they would
2  give you information about where your car had
3  been towed.  I knew I was legally parked, so
4  there wouldn't be any reason for PPA itself
5  to move my car.
6        So I called the Sixth District and I
7  believe I spoke to the desk sergeant or
8  someone switched it to him.  And he told me
9  that my car had been towed to the 100-block
10 of Water Street.  And so I then sat on the
11 step and called both of my sons, waiting for
12 them to call me back to see if someone would
13 drive me down to Water Street and help me
14 find my car.
15       My youngest son said he could take me,
16 so he came and met me at Front and Arch and
17 we drove down to Water Street and under 95
18 and kept driving around and around up and
19 down all the aisles, couldn't find my car.
20 And then we did it again.
21       The entire time I was on the phone
22 trying to reach out also to PPA thinking that
23 maybe they knew where the car was because the
24 police -- I think I was also reaching out to

Page 32

1  the police, because my car was not where they
2  said it was.  So the officer said, well,
3  maybe it's 100 North Water Street.  And I
4  said to him, I don't think Water Street goes
5  up north, I'm from that area, I don't ever
6  recall there being Water Street above Spring
7  Garden or anything.
8        So he then said, well, let me call the
9  towing company.  And he put me on hold and he
10 came back and said the towing company does
11 not have your car.  Your car -- maybe your
12 car has been stolen.  So I think my son and I
13 were out for one and-a-half or two hours, I
14 know it was a long time, because my son was
15 getting frustrated as well.
16       So the officer said, you're going to
17 have to fill out a stolen car report and so
18 you're going to need to go back to your --
19 where you parked your car and then call and a
20 police officer will come out and take the
21 report.
22       So I told my son, look, I'll call,
23 just take me home.  I'll call the police, it
24 will take them a while to come here and, you

Page 33

1  know, fill out the report and all.  And so I
2  said just take me home.
3        So we were still driving up from Water
4  Street and we came across Arch and he kept
5  going on Arch rather than making a left turn
6  onto Second and went past the Besty Ross
7  House and the fire station, I think it is,
8  that's on Third, and my car was on that block
9  of Arch Street in a metered spot and it had
10 three parking tickets on the windshield.
11 Q.    I am going to pause you there and ask
12 a couple follow-up questions for what you
13 just said.  So you said initially you were
14 transferred to the desk sergeant when you
15 called the police.
16 A.    Yes.
17 Q.    How long were you on the phone with
18 the police the first time that you called?
19 A.    Probably five minutes or something.  I
20 think I submitted documents that showed the
21 record on the -- my mobile phone, how long,
22 you know, I was on the call, I think.  But it
23 wasn't that long because initially, I think
24 -- again, and I apologize, that the officer's

Page 34

1  name was Chang or Chung, I knew it was
2  something like that, but I didn't write it
3  down, I was just interested in picking up my
4  car.
5        And we have said before my car was
6  towed once before, and that time I was able
7  to find it under Water Street.  So when he
8  indicated this time, the officer, that it was
9  parked under -- on Water Street, I thought,
10 okay, great, we'll just go down there and
11 I'll get my car.
12 Q.    Do you know whether that is a typical
13 place for cars to be towed to in your
14 neighborhood?
15       MS. MANOHAR:  Object to the
16       form.  You can answer.
17       THE WITNESS:  I don't know.  I
18       just know that in the first
19       instance it was down there.
20 BY MS. REINHART:
21 Q.    Do you recall whether the sergeant who
22 directed you to Water Street said if he was
23 looking at any certain information?
24 A.    No, he did not.

Page 35

Q.    Okay.  While you were driving looking
for the car, you indicated that you were on
the phone with, I believe it was the PPA and
police.  Were you calling back and forth
between the two?
A.    Yes, I couldn't find my car.  I just
didn't know what happened to it.  And, again,
it was no where.
      PPA was hard to reach, it was a
Saturday.  I think the only phones that are
open in PPA are the ones at the tow lot.  So
I did reach PPA, I think they said that my
car wasn't in their lot.  And then I kept
calling back to the police district because I
didn't know where my car was.
Q.    Do you know approximately how many
times you called PPA?
A.    Yes, a lot, because my phone died, I
was using it so much.  And then I had to use
my son's phone.
      It's impossible -- I shouldn't say
it's impossible, but it's a lot of work to
reach PPA, at least my experience that is.
Q.    You said that you provided mobile

Page 36

phone records, would all of those calls that
were not made on your son's phone be within
those records?
A.    I think so.  I'd have to go back and
check Shelly.  I don't know.
      Well, yes, the phone companies would
have records of all those.  I don't know how
much I provided, but I was really trying to
settle this with PPA for different reasons.
Was trying to provide as much documentation
to them that I could because I had been --
had three parking tickets and then it
escalated, the fines.  So I was trying to get
this taken care of.  Plus I was up for my
parking permit to be renewed.
Q.    Okay.  You said at one point in time
you called the police and they checked with a
tower, I believe?
A.    That's what I was told.
Q.    Do you know who that tower was?
A.    No, I do not, no.  I believe I asked,
but they wouldn't give it to me.  I can't be
certain of that, because again, I was trying
to find out as much information as I could.

Page 37

Q.    So do you recall approximately when it
was first suggested that you fill out a
police report -- a stolen report
specifically?
A.    It was when I couldn't find the car
and I kept calling back to the police
district, you know, telling them I couldn't
find my car.
      We had attempted to go up to North
Water Street, which didn't exist.  It wasn't
even on a GPS or anything like that.  We had
driven around -- not only under 95 at Water
Street, we had driven around the neighborhood
too just to make sure that my car wasn't
somewhere along one of the streets that
bordered to that.  So I don't know the exact
time, I know it was a couple hours after I
had first gone out.  It was still daylight,
I'm guessing maybe 3:00 at that point, not
sure if I started out at noon, you know, it
was like 3:00.
Q.    Okay.  And do you recall whether --
strike that.  I'm going to keep on moving.
      Had there been any temporary no

Page 38

parking signs on that block that you had seen
that entire week?
A.    I'm not -- I don't usually go around
that block.  If I'm doing any interaction,
it's more on Market Street that I'm on foot
so I wouldn't know.
      But I had known that the north side of
Arch Street, they were taking an old
restaurant equipment place called National
and making it into condos, so to my knowledge
I known that there were -- throughout that
summer there were some things happening in
the streets, but nothing was there the day
that I parked.  I was very cognizant of that,
again, because I live in that area.
      It's a very popular area for film
crews, a lot of things go on, so I'm very
cognizant of where I park my car and to make
sure of that.
Q.    Have you had to move your car in the
past for film crews doing work?
A.    Not to move, but not to park.  The
signs go up so, you know, there are all
kinds of things that happen.

1    The first time my car was towed was
2 because the Water Department -- I was told
3 this because the car was towed from Church
4 Street, my address, and during the week the
5 water company had to get into the street, so
6 they towed all the cars away, a neighbor told
7 me that when I came out and my car wasn't
8 where I parked it.
9 Q.    Do you recall any other times that
10 your car was moved because of some kind of
11 either utility or construction work?
12 A.    Again, I'm not quite sure.  All I know
13 is if there is temporary no parking, I don't
14 park there.  I'm not sure whether it's
15 construction, water, or if someone is moving
16 and has petitioned to have some parking in
17 the area roped off, just know not to park
18 there.  Yes, okay.
19 Q.    Okay.  Have you ever had to move your
20 car after it was already parked because of
21 any kind of work being done?
22 A.    Not that I can think of.  I think
23 maybe once someone was moving from Church
24 Street and I had been parked on Church

1 Street, and after I parked there someone put
2 up a temporary parking that I didn't know and
3 I think -- I believe the police came and
4 knocked on my door and asked me to move it
5 and I moved it.
6 Q.    Do you recall any other time that you
7 -- just to let everyone know, I got a
8 notification that my internet is unstable so
9 please let me know if you can't hear me at
10 any point.
11    Do you recall any other situation
12 where your vehicle has been towed in the last
13 six years while you were living in this
14 neighborhood of Philly?
15    MS. MANOHAR:  Object to the
16    form.  You can answer.
17    THE WITNESS:  Yes, my car was
18    towed a third time, I'm not sure if
19    it was from Front Street or Church
20    Street, but I went out and the car
21    wasn't there.  And then I called
22    the Sixth District and I was told
23    at that time that a police officer
24    would be out to my home shortly.

1    And then a police officer came
2    and knocked on my door and I told
3    him what had happened.  And he was
4    talking to the District or
5    something, and he drove me around
6    and he told me that he knew where
7    my car was towed to.  So he drove
8    me to the spot and my car was
9    there.
10 BY MS. REINHART:
11 Q.    Do you recall when that was?
12 A.    I think it was within the last year or
13 so.
14 Q.    So some time in 2022?
15 A.    Yeah.  Yes.  Late '20, '21, '22.  It
16 wasn't in the last six months or so, no.
17 Q.    Do you know the reason that your car
18 was towed that time?
19 A.    No, I don't.
20 Q.    Do you know who towed it?
21 A.    No.  Again, if my car is legally
22 parked, if this happened to me today I would
23 call the Sixth District again and ask them,
24 you know, if they knew where my car had been

1 towed.
2 Q.    For the incident that we are here for
3 today, do you know why your car was moved
4 then?
5 A.    No, I do not.
6 Q.    Do you know who towed it?
7 A.    I do not know.  After it was towed and
8 the tickets were issued, I was trying to
9 gather information to dispute the parking
10 tickets that I got.  And I was told that
11 there were several towing companies that are
12 licensed in the City of Philadelphia that tow
13 cars.  So they gave me the name -- I think it
14 was PPA gave me the name of one company, I'm
15 trying to think of their name, and I know
16 that I spoke directly to a woman in their
17 office, she was very nice -- I want to say
18 Michelle or something -- and she told me that
19 her company did not tow my car.  She gave me
20 the name of four other towing companies in
21 Philadelphia that she knew of that also tow
22 cars.
23    So I reached out to those trying to
24 get information, which was difficult because

Page 47

```
 1        deposition resumed at 2:15 p.m.)
 2                   -   -   -
 3  BY MS. REINHART:
 4  Q.      After a short break we are coming back
 5  on to the record.  Can you hear me okay, just
 6  to start off?
 7  A.      Yes.
 8  Q.      Great.  So circling back to when you
 9  found your car, you said that you found it
10  the same day that you realized it was lost;
11  is that correct?
12  A.      Yes.
13  Q.      Okay.  And it had been a few hours in
14  between when you first realized it was lost
15  until when you found it?
16  A.      Yes.  You know, yes.
17  Q.      Can you describe exactly what the
18  parking spot was that it was found in?
19          MS. MANOHAR:  Would you mind
20          repeating the question?  You cut
21          out briefly.
22          MS. REINHART:  Yeah,
23          absolutely.  I also asked a
24          confusing question.
```

Page 48

```
 1  BY MS. REINHART:
 2  Q.      The parking spot that you found it in,
 3  can you describe what the restrictions were
 4  on that parking spot?
 5          MS. MANOHAR:  Object to the
 6          form.  You can answer.
 7          THE WITNESS:  No.  All I know
 8          is that we were driving past -- we
 9          were driving over Arch Street and I
10          was in my son's car, and he went,
11          mom, isn't that your car.  So I
12          looked over and it was in a metered
13          spot with three parking tickets on
14          it.  That's all I recall.  I know
15          that area is not in a permitted
16          area for parking for Zone 10.
17  BY MS. REINHART:
18  Q.      Okay.  So that's the reason that even
19  though it is within the typical limits of
20  Zone 10, that it still would get tickets for
21  sitting there?
22          MS. MANOHAR:  Object to the
23          form.  You can answer if you
24          understand.
```

Page 49

```
 1          THE WITNESS:  There are more
 2          businesses on that block, so it
 3          wouldn't be allowed as a parking
 4          permitted space, a residential
 5          permit space.
 6  BY MS. REINHART:
 7  Q.      Do you know when the car was moved to
 8  that parking spot?
 9  A.      No, I do not.  But there were parking
10  tickets, three of them, and I believe I know
11  from the website that one was issued out each
12  day, I'm guessing Tuesday, Wednesday,
13  Thursday or something like that.  PPA would
14  have that exactly.
15  Q.      So it was three different days that
16  the tickets were issued on?
17  A.      That's correct.
18  Q.      Do you recall whether there was a
19  ticket issued for the day that you found it?
20  A.      I do not believe so but I'm not sure.
21  I'd have to go back.  But I know it was one
22  for each day.
23  Q.      How much was -- were all the tickets
24  the same value to start off with?
```

Page 50

```
 1  A.      Yes, they were each $36.
 2  Q.      And you said that there was a -- I
 3  forget the word you used, but there was some
 4  type of penalty added after they made some
 5  kind of determination on your appeal?
 6  A.      I think that if you do not pay a
 7  parking ticket within 30 days, it is
 8  automatically fines are added, unless you
 9  dispute it and you're given that ability
10  online.
11  Q.      Okay.  What was the amount of the fine
12  that was added to these tickets?
13  A.      I believe the amount -- well, the
14  total amount that I had to pay for each
15  violation then was $110.  So I can do the
16  math in my head, but that's about it, $70.
17  Q.      Okay.  So the total that you ended up
18  paying for parking tickets here was $330?
19  A.      I believe so, yep.
20  Q.      You said that you were concerned about
21  how these tickets would affect your ability
22  to get a Zone 10 Parking Permit.  Did these,
23  in fact, change your ability to get that
24  permit?
```

Page 51

A.    I had to pay it in order to get the
permit, so I knew that.  So I paid it to get
the permit renewed.
Q.    When did you get the Zone 10 Parking
Permit?
A.    Not sure.  From subsequent
conversations, I was told the permit itself
would not be mailed because PPA was behind in
their mail, but that the officers, PPA
officers would know that I had gotten the
permit and wouldn't issue me a ticket for not
having a permit.
Q.    Do you recall when it was that you
were told you were issued the permit and just
had to wait for it to come in the mail?
      MS. MANOHAR:  Object to the
      form.  You can answer if you
      understand.
      THE WITNESS:  I'm guessing
      late December.  I'm not sure.
BY MS. REINHART:
Q.    So had you already paid for the
parking tickets at that time?
A.    I paid online.

Page 52

Q.    Before you got the confirmation that
you were getting the parking permit?
A.    I went down to the PPA offices at
Eighth and Filbert and got the permit through
them.
Q.    Okay.  My question is about which
happened first.  Did you first pay for the
parking tickets or did you first get the
permit renewal?
A.    I paid for the parking tickets first
online.  And then afterwards when I had paid
for the parking tickets and fine, I then went
to PPA offices to get the parking permit.
Q.    Okay.  Do you recall when it was that
you paid the tickets online?
A.    No, I don't.  I'm guessing could be
December.
Q.    Okay.  So you're saying you paid for
the tickets online in December and you also
got the parking permit in December?
A.    I went to get the parking permit, I
hadn't got -- I secured the parking permit
through PPA after I paid the tickets.  I
believe I went to their office right on

Page 53

Eighth Street, Eighth and Filbert.
Q.    And that happened in December also?
A.    I believe so.
Q.    Okay.  The parking permits run from
what, January to January?
A.    No, I believe it's annual renewal, due
when you first secure the parking permit.
And then it's an annual renewal at the time.
So everyone isn't at the same date.
Q.    Okay.  Did you have a lapse in your
permit parking?
A.    I don't believe so.  Again, parking is
very important to have it down there so I
know that it has to be renewed.
Q.    When you found your car, was there any
damage to it?
A.    No.
Q.    Were there any items missing?
A.    No, not -- no.
Q.    Did you have any other damage as a
result of your car being towed?
A.    No.
Q.    Okay.  So just from my notes, and they
could be incomplete, so I would like you to

Page 54

correct me, let me know if I'm missing
anything, I have that the total damages from
this were $330 as a result of the three
parking tickets; is that correct?
A.    Yes, that's how much money I put out,
yep.
Q.    Okay.  Give me just one moment.
      After you found your vehicle, you
didn't fill out a police report then,
correct?
A.    Correct.  I called the Sixth District
and told them I found my car.
Q.    Okay.  Okay.  So an officer didn't
meet you at any point that day, correct?
A.    Correct.  I never called back to say
my car was stolen in order for a police
officer to come back to the space where I
left my car.
Q.    Did you file an insurance claim for
this incident at all?
A.    No.
Q.    I think I know the answer to this but
I'm going to ask it anyway:  Did you receive
any kind of medical treatment?

Page 55

1  A.    No.
2  Q.    Is there anything else that I have not
3  asked you about that supports your claim for
4  this case?
5  A.    Not sure.  I told you all that I
6  remember.
7  Q.    Okay.  I am going to share my screen.
8  This is the complaint that was filed in this
9  case.  Give me just one moment to bring it
10 up.
11       Are you able to see this on the
12 screen?
13 A.    Yes.
14 Q.    You can see it says Page 6 at the
15 bottom and in bold letters centered toward
16 the top it says Plaintiff Eastman?
17 A.    Correct.
18 Q.    It looks like there are three
19 paragraphs here, paragraphs No. 24, 25 and 26
20 that describe everything generally that
21 you've testified about today so far; is that
22 fair to say?
23 A.    Yes.
24 Q.    Okay.  For paragraph No. 24, I'm going

Page 56

1  to first just read it out loud and then I'm
2  going to ask you just what is correct.  "On
3  or about November 9th, 2020, Plaintiff
4  Eastman parked her car in a legal Zone 10
5  parking space on the 100-block of Arch
6  Street."  Just pausing there, is all of that
7  information correct?
8  A.    Yes.
9  Q.    Okay.  I'm going to continue to read,
10 "On or about November 14th, 2020 --
11             MS. MANOHAR:  I'm going to
12       object.  This is the complaint that
13       was filed in federal court.  I
14       mean, all of the information in the
15       complaint is understood to be
16       correct.
17             I'll allow her to continue to
18       answer the questions.
19             MS. REINHART:  Thank you.
20 BY MS. REINHART:
21 Q.    "On or about November 14th, 2020,
22 Plaintiff Eastman returned to the 100-block
23 of Arch Street to use her vehicle, only to
24 find it was not there."  Is that all

Page 57

1  correct?
2  A.    Yes.
3  Q.    Okay.  Moving on to paragraph 25:
4  "Plaintiff Eastman contacted the Sixth Police
5  District.  A police officer informed her that
6  her car had been towed to the 100-block of
7  Water Street, a half mile from where she had
8  originally parked it due to unspecified work
9  being done in the 100-block of Arch Street."
10 Is all of that correct?
11 A.    Yes, to my knowledge, yep.
12 Q.    Okay.  And fair to say you never found
13 out what that unspecified work was?
14 A.    No.  I didn't question it, no.
15 Q.    Okay.  Moving on to paragraph 26,
16 "Eventually Plaintiff Eastman found her car,
17 not on the 100-block of Water Street, but in
18 a metered parking spot on the 200-block of
19 Arch Street with several tickets on the
20 windshield."  Is that correct?
21 A.    Yes.
22 Q.    And when it says, eventually you found
23 your car, that was the same day, correct?
24 A.    Yes.

Page 58

1  Q.    Okay.
2  A.    The same day as I went looking for it,
3  yes.
4  Q.    Okay.  Continuing to read from that
5  same paragraph, "These tickets had been
6  issued because her car had been towed by the
7  City to a metered space, through no fault of
8  her own."  Do you know that all parts of that
9  sentence are correct?
10             MS. MANOHAR:  Object to the
11       form.  You can answer.
12             THE WITNESS:  Yes.  Correct.
13 BY MS. REINHART:
14 Q.    Okay.  So previously you testified you
15 did not know who towed your car, but this
16 says that the City towed the car.  Do you
17 have any reason to believe that the City was
18 the entity that towed your car?
19             MS. MANOHAR:  Objection.  All
20       of these allegations were pled upon
21       information and belief.  The
22       plaintiff is going to testify
23       consistent with her complaint upon
24       information and belief.

Page 59

1    You can answer.
2        MS. REINHART:  I'm not asking
3    upon information and belief.  I'm
4    asking if she has any knowledge
5    that the City towed her car.
6    That's the specific question that
7    I'm asking her.
8        MS. MANOHAR:  You can answer
9    if you understand.
10       THE WITNESS:  I understand.  I
11   was told that the City licensed
12   five companies to tow cars in the
13   city.  So did those -- so the City
14   was responsible for the towing.  So
15   that's my answer.  I don't know
16   what else to say.
17   BY MS. REINHART:
18   Q.    Okay.  You said that you reached out
19   to these five towing entities, correct?
20   A.    Yes.
21   Q.    And you didn't find out who it was --
22   or rather none of those five entities said
23   that they towed your car?
24   A.    Of the five entities, I think maybe

Page 60

1    two said they didn't, and the others didn't
2    want to take time to find out.
3    Q.    Okay.  Do you have any specific
4    information that it was the City that towed
5    your car?
6    A.    Well, no.  I knew it wasn't PPA.
7    Q.    Have you ever filed a lawsuit before
8    this case?
9    A.    I have right now -- no.  No.
10   Q.    There seemed to be a pause there.  Is
11   that because you filed something after this
12   case was filed?
13   A.    I've just been appointed Administrator
14   of an Estate in New Jersey, so that's totally
15   different.  That's the only thing.
16   Q.    Okay.  Thank you for clarifying that.
17       I ask this to everybody, it's not
18   specific to you, but I have to ask, have you
19   ever been convicted of a crime?
20   A.    No.
21   Q.    Okay.  I am going to ask for a
22   five-minute break.  Is that okay for
23   everyone?
24       MS. MANOHAR:  Sure.

Page 61

1        MS. REINHART:  It's
2    approximately 2:40 right now, so
3    let's plan to come back at 2:45.
4                - - -
5        (Whereupon, a brief recess was
6    taken at 2:40 p.m. and the
7    deposition resumed at 2:45 p.m.)
8                - - -
9    BY MS. REINHART:
10   Q.    Going back on the record, we just took
11   about a five-minute break.
12       The only questions that I have
13   outstanding are what are you looking for from
14   this lawsuit?
15   A.    Hoping that some changes will be made
16   so that this doesn't keep happening in the
17   city.
18   Q.    Okay.  So what you're looking for is
19   policy change essentially?
20   A.    I'm not sure how -- yes, I guess it
21   would be policy.  How you handle -- how the
22   City would handle towing of cars.  How the
23   City would handle licensing of those towing
24   companies.  It seems to me a fairly easy fix

Page 62

1    to any software system that the Philadelphia
2    -- that the City of Philadelphia would have.
3    Q.    Okay.  What type of software fix are
4    you envisioning?  I'm just trying to
5    understand what it is that you're looking
6    for.  I'm not trying to put you --
7    A.    I don't know, but if the officers that
8    go around and they just put a little
9    computerized handheld device at a license
10   plate and can tell all kinds of things at
11   issues whether they have a permit or whether
12   they have put money in a meter, it seems to
13   me that that same type of software can be
14   used to identify cars that are being towed.
15   I really don't know.  I don't know what your
16   software is.  I just know that out there
17   technology would make things easier, make it
18   easier to let someone know your car is going
19   to be towed.
20   Q.    Okay.  When you referenced someone
21   going with a handheld device and the
22   information they are able to see about either
23   the car or the driver, anything like that,
24   are you talking about PPA there?

Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

KATHLEEN EASTMAN, Et.    :
al.                      :
                         :
          Plaintiffs,    :
     v.                  :
                         :
THE CITY OF PHILADELPHIA :
                         :
          Defendant      :   NO.  21-2248 (MSG)

- - -

SEPTEMBER 7, 2022

- - -

        Video teleconference deposition of
MARY HENIN, taken pursuant to notice, commencing at
10:07 a.m., on the above date, before Brittany
Butterworth Sacco, Professional Court Reporter and
Notary Public in and for the Commonwealth of
Pennsylvania.

- - -

**Page 3**

```
 1                - - -
 2              I N D E X
 3                - - -
 4 MARY HENIN                         PAGE
 5  By MR. JOHNSON                       4
 6
 7
 8              E X H I B I T S
 9                - - -
10 NO.           DESCRIPTION          PAGE
11  (NO EXHIBITS WERE MARKED FOR IDENTIFICATION.)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1                - - -
 2              (It was stipulated by and
 3          between counsel that reading,
 4          signing, sealing, certification, and
 5          filing be waived; and that all
 6          objections, except as to the form of
 7          the question, be reserved until the
 8          time of trial.)
 9                - - -
10              MARY HENIN, after having
11          been first duly sworn, was examined
12          and testified as follows:
13                - - -
14 BY MR. JOHNSON:
15      Q    Miss Henin, how long have you
16  lived in Philadelphia?
17      A    Since September 2014 so almost
18  eight years.
19      Q    And where were you living before
20  that?
21      A    Chicago.
22      Q    And how long -- what's your
23  birth date?
24      A    July 19, 1998.
```

**Page 5**

```
 1      Q    Have you held a driver's
 2  license?
 3      A    Yes.
 4      Q    And for how long?
 5      A    Since I was 16 years old.
 6      Q    Where did you obtain your first
 7  driver's license?
 8      A    Virginia.
 9      Q    Did you grow up in Virginia?
10      A    Yes.
11      Q    What brought you to
12  Philadelphia?
13      A    My job.  I graduated law school
14  and I started working at the public defender's
15  office.
16      Q    And did you obtain a
17  Pennsylvania driver's license?
18      A    Not when I first moved.
19      Q    But you have since?
20      A    Yes.
21      Q    When did you obtain your first
22  Pennsylvania driver's license?
23      A    If I recall it was last year.
24  My Virginia license was valid up until it
```

**Page 6**

```
 1  expired a year or two ago.
 2      Q    Okay.
 3           And when you moved to
 4  Philadelphia, did you own a car?
 5      A    Not when I first moved.
 6      Q    Did you at some point purchase a
 7  car?
 8      A    I didn't purchase it.  This was
 9  my family's car.  My father couldn't drive any
10  more so I took it.  In maybe around 2017 is
11  when I brought it to Philly.
12      Q    Okay.
13           So were you -- when you say this
14  -- this was your family's car, what car are you
15  referring to?
16      A    The car that is referenced in
17  the lawsuit.
18      Q    What's the make and model of
19  that car?
20      A    2008 Nissan Altima.
21      Q    And were you the registered
22  owner of that vehicle at any time?
23      A    No, my parents are.
24      Q    Was that vehicle ever registered
```

Page 19

1  or bike.
2        Q        You biked to work?
3                 So wait, the trolley goes where
4  from there?
5        A        The 13 trolley runs along
6  Chester Avenue and goes to 13th City Hall.
7        Q        Okay.
8        A        So I usually pick it up on
9  Chester.
10       Q        Do you have any kids or other
11 dependents?
12       A        No.
13       Q        Now, at that time that we're
14 talking about in January and February of 2020,
15 the car was still registered to your parents;
16 is that right?
17       A        To my mother.  My father had
18 since passed.
19       Q        Was the car insured?
20       A        Yes.
21       Q        Can you provide documentation
22 for those dates?
23       A        Yes.
24       Q        Was your insurance company ever

Page 20

1  notified that the car was domiciled in
2  Philadelphia at the time?
3        A        I don't recall.
4        Q        Did you ever call the insurance
5  company?
6        A        I don't recall.
7        Q        Do you know if your dad had a
8  financing agreement on that car?
9        A        No, it was fully financed.
10       Q        So he had paid off the car?
11       A        Yes.
12       Q        Okay.
13                When did he purchase the car?
14       A        I don't remember.
15       Q        Do you know if the registration
16 was renewed without any lapse during that
17 period?
18       A        I believe it was.
19       Q        Can you provide the records
20 showing?
21       A        I can probably obtain them from
22 the state.
23       Q        Okay.  All right.
24                So -- so have you ever had your

Page 21

1  car towed prior to January of 2020?
2        A        I don't think so.  I'm pretty
3  certain no.
4        Q        Did anyone you know ever have
5  their car towed?
6        A        Ever?
7        Q        Ever.
8        A        I'm sure I know someone whose
9  had their car towed.
10       Q        Did you talk to them about it?
11       A        Yes.
12       Q        They told you about it?
13       A        Yes.
14       Q        Do you recall what the details
15 were?
16       A        Off the top of my head I do have
17 a friend who was courtesy towed several months
18 before I was.  I think it's the first time I
19 learned about courtesy towing.
20       Q        And what did your friend tell
21 you about it?
22       A        She told me that she got a
23 ticket because her car was sitting in the
24 middle of Washington Avenue and that she didn't

Page 22

1  put it there and she had learned after the fact
2  that the City had moved it and put it in an
3  illegal parking spot.
4        Q        Was she -- she said she was
5  parked in the -- in the central turning lane,
6  the median lane on Washington Avenue?
7        A        That's where the City left it or
8  the towing company.
9        Q        Or the towing company left it
10 there?
11       A        Right.  She had parked it
12 legally and then it got courtesy towed and left
13 in the middle of Washington Avenue.
14       Q        Okay.
15                And did she -- did she ever
16 relay to you how she went about tracking down
17 where the car was?
18       A        I don't remember.  I don't
19 remember if she called the police or if she
20 called the district.  I only remember that she
21 had found her car in the middle of Washington
22 Avenue.
23       Q        When did you have this
24 conversation with her?

Page 23

```
1         A       It was several months before my
2  car was towed.  I can't say exactly.  It was
3  probably sometime in the winter or fall of
4  2019.
5         Q       And who -- who was this friend?
6  What's her name?
7         A       This was my office maid at work.
8  Her name is Angelica Hendrix.  She was my
9  office maid at the time.
10        Q       How would -- has anyone else
11 ever talked about getting their car towed in
12 Philadelphia?
13        A       Yes.  I know other people who've
14 been courtesy towed or just had their cars
15 moved by PPA from illegal spots.
16        Q       So in regard to the incident
17 where your car was towed, when had you last
18 parked the car?
19        A       February 5th of 2020.
20        Q       So you parked the car on
21 February 5th.
22                Where -- what had you been out
23 doing with the car?
24        A       I was visiting clients up on
```

Page 24

```
1  State Road at the jails.
2         Q       And what -- where did you park
3  the car?
4         A       On the northern side of 4200
5  Chester Avenue.
6         Q       Is that the side where your
7  residence is?
8         A       Yes.
9         Q       If you could describe in
10 relation to your building, was -- how close was
11 it to your building?
12        A       4209 is pretty central in the
13 block.  I'd say it's just west of the center of
14 the block and I parked probably two to three
15 car lengths east of my residence.  It wasn't
16 far.
17        Q       Could you see it from your
18 apartment?
19        A       I don't remember.  My apartment
20 was on the west corner so it's possible I
21 couldn't.
22        Q       What time of day did you park
23 the car?
24        A       I don't recall exactly, but it
```

Page 25

```
1  would have been in the afternoon.
2         Q       Was it a weekend day?
3         A       No, it was a Wednesday.
4         Q       You parked there.  You were
5  coming from State Road.
6                 Was it a social engagement you
7  were at?
8         A       No, I was there for work.  I was
9  at the jails, the county jail.
10        Q       All right.
11                When was the next time you saw
12 your car after you parked it?
13        A       On February 14th when I found it
14 in the location it had been moved to by the
15 City or the towing company.
16        Q       So wait a minute.  You parked
17 your car on the 5th after work.
18                You never saw it between then
19 and the 13th?
20        A       I mean, I'm sure I did walking
21 to the trolley or walking around the
22 neighborhood, but I didn't look for it to use
23 it until February 12th which is the day I
24 realized it was missing and then February 13th
```

Page 26

```
1  I found it.
2         Q       Would you say -- I mean, if you
3  walked out your building, in relation to where
4  you had parked the car, would you have seen the
5  car from walking out front of your building?
6         A       It wouldn't have been directly
7  in front of my face.  I would have had to turn
8  and look up and make sure it was there.
9         Q       And how far would you say -- how
10 many car lengths down was it?
11        A       I think I said two or three.  It
12 wasn't quite on the exact corner of 42 and
13 Chester, but it was east of my building
14 entrance.
15        Q       And to go to the trolley, would
16 you walk east or west?
17        A       I would walk east either on the
18 same or across the street and walk up because
19 the trolley was on the south side of the block.
20        Q       Okay.
21                So -- so you would you walk by
22 the car going to the trolley?
23        A       I could have, yes.
24        Q       Okay.
```

Page 27

1    Was anyone with you when you
2 parked the car?
3    A    No.
4    Q    When you parked the car, did you
5 notice any temporary no parking signs from the
6 City at that point?
7    A    No.
8    Q    Have you seen those on that
9 block before?
10    A    Yes.
11    Q    Are you familiar with what kinds
12 of temporary signs that the City posts or other
13 residents post?
14    A    I'm sorry.  The audio went out.
15    Q    Temporary no parking signs, have
16 you seen those in the City before that?
17    A    Yes.
18    Q    What was your understanding of,
19 like, what those signs meant?
20    A    For the -- they indicate a
21 period of a time that you couldn't park your
22 car there.
23    Q    When you were looking for
24 parking, did you ever look at those signs,

Page 28

1 like, look at the dates?
2    A    Sure.  Sure.  If a sign is there
3 I'll read it before parking.
4    Q    Do you recall what was the
5 weather like when you parked the car?
6    A    I don't remember.
7    Q    Are there trees on that block?
8    A    Yes.
9    Q    Would they obstruct view of the
10 cars?  If you were to look around the block,
11 would they be in your way if you were standing
12 on the sidewalk looking at the cars that are
13 parked?
14    A    They could.
15    Q    Did you notice any street work
16 or utility work occurring in the area when you
17 parked the car?
18    A    No.
19    Q    How about in the days after
20 that, did you notice any work being performed
21 on that block?
22    A    No.
23    Q    During that week between
24 February 5th and the next time you saw your

Page 29

1 car, you said February 13th, did you -- were
2 you sleeping at your house all those nights?
3    A    Not all those nights.
4    Q    How many -- how many days do you
5 think you were there?
6    A    I don't remember.  I can guess.
7    Q    Okay.
8    When did you notice that the car
9 wasn't there?
10    A    On February 12, 2020.
11    Q    February 12th.  Tell me about
12 that.
13    What are you doing when you
14 noticed?
15    A    So I was downtown at dinner with
16 friends.  My friend had asked to borrow the car
17 so I gave him the key earlier in the day.  And
18 then while I was at dinner with my friends I
19 got a call from my friend or a text, I don't
20 remember, saying that he couldn't find the car
21 and that he had walked up and down 4200
22 Chester, which is where I usually park, and
23 also 43rd, where I also usually park, and he
24 couldn't find the car.

Page 30

1    Q    What did you do after you heard
2 that?
3    A    I called an Uber to go to 4200
4 Chester to help him look for the car.  While I
5 was in the Uber I started calling the 18th
6 Police District to see if they had any
7 information about where the car could be.
8    Q    Do you work regularly with the
9 Philadelphia Police Department as part of your
10 job?
11    A    I encounter them as part of my
12 job, but as a defense attorney I rarely work
13 with them.
14    Q    Do you know any of the officers
15 from that police district?
16    A    Personally, no.
17    Q    Had you had dealings with them
18 in court ever?
19    A    Yes, 18th District officers come
20 into court frequently.  I can't say there's one
21 particular officer I've dealt with more than
22 any other.
23    Q    Had you ever called the 18th
24 Police District before?

Page 31

A        Probably not.  I sometimes call
police districts as part of my job, but I
didn't work in what was called the southwest
district at the time so it's possible I called
the 18th District for work, but nothing else.
        Q        So what steps did you take to
try and locate the car?
        A        I called the 18th District and
asked them if they were aware of any towing or
any reason why the car would have been moved
from that block.  I called them several times
each time asking for new information or give me
new information.  Each time I called them they
either told me to call PPA or to call 911 and
report the car stolen.  So I called PPA.  I
called the PPA tow lot who said that they had
no record of the car and they told me that if
it was moved by the City or if it was courtesy
towed they wouldn't have a record of it, that
the police district would have moved it or
would have been in charge of moving it.  So I
called the 18th District back and told them,
you know, what I had learned from PPA and they
told me that the only way to generate any sort

Page 32

of paper trail that the car was missing was to
call 911 and report it stolen so eventually I
did that.
        Q        So the 18th District, just to
confirm, you said they didn't have any record
of it being courtesy towed; is that right?
        A        That's right.
        Q        What did you do after that?
        A        After calling 911 I waited for
the officers to respond.  Two officers came.  I
gave a stolen vehicle report and they said that
they would drive around the block looking for
it.  They asked me for distinctive
characteristics about the car that would make
it stick out and so I described the car to
them, gave all the license information, that
kind of thing.  And then the next day I went
out on my own to look for the car.
        Q        Did you talk to anyone who might
have been on the block to see if they had seen
anything happen to the car?
        A        No.  It was late at night.  I
don't remember that many people, if anyone,
being out on the block.

Page 33

        Q        Did you talk to any friends or
neighbors there about activities on the block
related to your car?
        A        No.
        Q        Did you ask anyone in the
neighborhood about whether there was any work
performed on that block?
        A        No.
        Q        Did the police ever tell you
about any work that had been performed on that
block?
        A        No.
        Q        And, just apologies, I'm
backtracking a little.
                But about the car, this was your
dad and your mom's car, they were joint owners?
        A        Correct.
        Q        Were you responsible for
maintenance of the vehicle?
        A        Yes.
        Q        Did you ever have the car
inspected in Pennsylvania?
        A        No.
        Q        Did you have the car inspected

Page 34

in Virginia?
        A        Yes, each year.
        Q        Did you drive it down there
every year to have it inspected?
        A        Yes.
        Q        Did you have any trouble with
the car around that time?  Was there any work
that needed done or maintenance issues?
        A        No.
        Q        All right.
                When you were without the car
that night, how did that make your feel?
        A        Frustrated, worried, annoyed
that I was getting the run around from the
police district, everything you can imagine
when you think your car has been moved by the
City or stolen.
        Q        Did you talk to people about it?
        A        Yes.
        Q        Who?
        A        Friends, family.
        Q        Did you call your parents?
        A        I probably called them the next
day because it was probably 10:00 at night by

Page 39

1 Chester or 43rd south of Chester.
2         Q        And so the police district had
3 that report.
4                 Did you have any other
5 interactions with the police district?
6         A        I'm not sure I understand the
7 question.
8         Q        You had talked to the officer.
9 He said the stolen report hadn't been filed
10 yet.
11                 And what happened after that?
12         A        After that I asked him what I
13 should do to make sure that the stolen report
14 doesn't get filed after the found report so
15 that the car would then continue to be in
16 stolen status. He suggested I call the 18th
17 District about a week later to confirm that the
18 car was not in stolen status so I did that and
19 I did call about the week after the 13th when I
20 found the car and the 18th District told me
21 that my car was not in stolen status.
22         Q        But they -- did they -- when you
23 talked to them, did you -- did you confirm
24 anything about the reports that you had

Page 40

1 submitted or that were made? Like, you had
2 made a report. You know that it was made and
3 it wasn't filed, but when you called back, did
4 you -- did they talk about the reports or did
5 they tell you the status wasn't as stolen?
6         A        I explained to them the
7 situation which was on February 12th the car --
8 I reported the car stolen and on February 13th
9 I reported it found. I told them I wanted to
10 be sure that it was not in stolen status and
11 that the stolen report had not over run or over
12 ridden the found report and they confirmed that
13 the car was not in stolen status.
14         Q        When you were having these
15 interactions with the 18th Police District, did
16 they ever provide you any documentation
17 regarding those interactions or the reports
18 that you had made?
19         A        Each time I made a police report
20 I asked the reporting officer to give me the DC
21 number, the district control number related to
22 the report, but I didn't get any other police
23 paperwork.
24         Q        So they never gave you a copy of

Page 41

1 any reports at that time?
2         A        No.
3         Q        Or did they send you any
4 correspondence afterwards?
5         A        No.
6         Q        So after you had that last
7 interaction you were describing where they said
8 a week later, do you recall the date when you
9 called to check on the status?
10         A        I don't remember the exact date,
11 but it was a week or more later.
12         Q        What happened after that?
13         A        After that I didn't think about
14 it until I was arrested in New Jersey, LBI on
15 May 29th of 2020.
16         Q        So you said May 29th?
17         A        Right.
18         Q        You were going about your normal
19 business in Philadelphia between February and
20 May 29th; is that right?
21         A        Yes.
22         Q        Did you continue to drive the
23 car?
24         A        Yes.

Page 42

1         Q        You continued to park the car as
2 you had described in your earlier testimony?
3         A        Yes.
4         Q        Did you continue to use it to
5 perform all the usual tasks, like, going to the
6 prison and going to work?
7         A        Yes.
8         Q        Okay.
9         A        Well, I should say though that
10 the pandemic shut everything down in mid March
11 2020 so I shouldn't say that it was business as
12 usual. I was no longer going into the prison
13 as frequently, if at all and I wasn't out and
14 about as much as you would be before the
15 pandemic.
16         Q        Were you working from home
17 during that time?
18         A        Yes. Since the pandemic shut
19 down the courts between March 16, 2020 and I
20 want to say June of 2020 fully. After June of
21 2020 there was a limited opening in which my
22 office began returning to certain tasks.
23         Q        So there were no hearings in the
24 criminal courts during that time?

Page 43

1    A         Certain hearings were
2  continuing, but on a very limited basis.
3    Q         So for your job, you weren't
4  going to the prisons during that time?
5    A         I don't think I returned to
6  State Road until summer of 2020.
7    Q         Did you hear at all from the
8  City about the tow or the police district about
9  your car during those months?
10   A         No, I did not get any
11  information until after the arrest and then the
12  complaint that I filed after that fact.
13   Q         So during February and then when
14  the pandemic hit during March, April and early
15  May, were you traveling outside the City in the
16  car?
17   A         Occasionally.  Very little was
18  open, but I would go to, for example, parks
19  outside the City just to get away from the City
20  for a little bit, grocery shopping, things like
21  that.
22   Q         Did you travel to visit your
23  parents out of state?
24   A         No, not in that time period.

Page 44

1    Q         Did you travel to visit any
2  other friends out of state during that time
3  period?
4    A         I don't think so, no.
5    Q         Would you say that when you went
6  to New Jersey, was that the first time you had
7  driven in New Jersey during that time period?
8    A         It's -- I think so, yes.  It's
9  possible we went to the shore another time, but
10  I don't think -- I don't think so.
11   Q         So describe that trip, where
12  were you heading?
13   A         I was visiting -- with my friend
14  we were visiting another friend in Long Beach
15  Island.  Their parents had a beach house there
16  and they were staying with them.
17   Q         Were you -- were you on your way
18  to the shore house when you got pulled over?
19   A         I was within 1,000 feet of the
20  shore house when we got pulled over.
21   Q         So were you coming from the
22  shore house or were you going to the shore
23  house?
24   A         Going.

Page 45

1    Q         Had you arrived yet for the
2  weekend or no?
3    A         No, this was the first day that
4  we had driven down.
5    Q         So you hadn't seen your friends
6  there yet?
7    A         Correct.
8    Q         Who was driving the car?
9    A         My friend.
10   Q         What's his name?
11   A         Bandar.  The same person I
12  referenced before.
13   Q         And before you got stopped, did
14  you notice the police in the area?
15   A         No.
16   Q         Had the police been following
17  you?
18   A         I don't know.  I was on the
19  phone talking to a different friend at the time
20  we had gotten pulled over so I wasn't really
21  looking around like that.
22   Q         I just want to go back and just
23  clarify one thing about when the vehicle had
24  gotten towed.  Like, when you -- if we go back

Page 46

1  to that first time, I believe it was the 12th
2  of February when you noticed the car was gone.
3            Did you suspect at that time
4  that it had been towed by the City?
5    A         Yes.
6    Q         Did you think it had been
7  stolen?
8    A         No.
9    Q         Did you file a report because
10  the police told you to?
11   A         Yes.
12   Q         Okay.  All right.
13            So when you got stopped back on
14  May 29th, were you surprised?
15   A         Yes.
16   Q         Tell us about that incident.
17  Tell us what happened.
18   A         I was on the phone with my
19  friend.  I told him I needed to get off the
20  phone immediately because four SUV police
21  officers had essentially blocked us in as we
22  had turned into a one-way street -- I'm sorry
23  -- a dead end street that would have been my
24  friend's house street.  On the mega phones and

Page 47

1  they were screaming things like stop, get out
2  of the car, throw the keys out the window, turn
3  off the car and throw the keys out the window.
4  They're just screaming into these mega phones.
5  So I told my friend I had to get off the phone
6  immediately.
7          I look in the passenger rear
8  view side mirror and I see that we're flanked
9  by these SUV cops and they're screaming at us.
10 I tell my friend to turn off the vehicle and
11 throw the keys out of the car.  We were so
12 panicked that he just managed to throw the car
13 in park.  Actually, I'm sorry.  He managed to
14 turn off the car and throw the keys out the
15 window without even putting the car in park.
16 The police officers ordered us out of the car.
17 They had guns pointed at us.  They told us to
18 put our hands behind our head and walk
19 backwards towards them without turning around.
20 They each handcuffed both of us and told us
21 that we were under arrest.
22     Q     Did you have any -- did you talk
23 to the cops at that time?
24     A     Yes.

Page 48

1      Q     What did you say?
2      A     I asked them why we were being
3  arrested.  They said that the car was stolen
4  and at that point I told them it was not stolen
5  and I had a police report -- I'm sorry -- a
6  police DC number confirming that in my vehicle.
7  First, I asked them when it was reported stolen
8  and they said February 2020 and at that point I
9  knew that we were talking about the incident
10 where it was towed and I had to report it
11 stolen and it was not, in fact, stolen.
12         So, you know, it took about an
13 hour for them to confirm that the car was not
14 stolen.  Originally they did get information
15 that it was stolen and that they should arrest
16 us, but I kept telling them to call the
17 Philadelphia Police District specifically the
18 18th District, give them the DC number for the
19 found report and confirm the car was not
20 stolen.
21     Q     How many -- how many police cars
22 were there again?
23     A     I believe it was four.
24     Q     And it was a residential

Page 49

1  neighborhood?
2      A     Yes.
3      Q     Just for the record I'm going to
4  ask this question, how do you feel you were
5  treated by the police at that time?
6      A     It was terrifying.  I mean, they
7  wouldn't -- I mean, they had guns pointed at
8  us.  They wouldn't really hear out what we had
9  to say until I was able to convince them to go
10 and pull that report and call the district.  At
11 first they refused to call the district.  They
12 said that it's not their responsibility, but I
13 told them that I was a lawyer and I just kept
14 encouraging them to do that.  Luckily, there
15 was a sergeant on scene who was willing to take
16 charge, but it was a terrible experience.
17     Q     What is your ethnicity?
18     A     I'm Egyptian.
19     Q     Okay.
20         And how about your friend who
21 you were with?
22     A     He's Saudi Arabian.
23     Q     Do you -- do you feel like you
24 would have been treated differently if you were

Page 50

1  white?
2      A     Yes.
3      Q     Did the police ever make any
4  statements that you felt went towards your
5  ethnicity?
6      A     No.
7      Q     Okay.
8          Do you think they acted
9  inappropriately at all?
10     A     Yes.
11     Q     And specifically why?  What
12 makes you say that?
13     A     The entire -- the entire
14 situation was extremely aggressive.  I'm sure
15 it was perfectly protocol for them to pull guns
16 on us, to flank us, to immediately handcuff us,
17 to not release us from the handcuffs when they
18 continued their investigation.  I'm sure all of
19 that was protocol, but it was aggressive.  It
20 was forceful.  It was scary and it was
21 inappropriate.
22     Q     So you said it took about an
23 hour for you to convince them to release you.
24         Were you placed in handcuffs?

Page 63

1  anymore.  He was sick and he had gotten
2  progressively more sick and I was making a lot
3  of trips to Virginia at the time and so instead
4  of taking the train back and forth my parents
5  offered that I take the car so that I could go
6  back and forth to Virginia.  And eventually my
7  father passed away and my mom didn't have use
8  for two cars because the car is jointly insured
9  and registered with her car.  It didn't make
10 sense to separate them or to sever them or to
11 change the registration so I never did.
12     Q     Do you -- do you still have the
13 car?
14     A     Yes.
15     Q     Is it registered in your name
16 now?
17     A     No, it's still in my mom's name.
18     Q     Does your insurance company know
19 that?
20     A     Yes.
21     Q     Okay.
22           Do you feel like -- did you ever
23 seek help from a therapist or anything as a
24 result of this?

Page 64

1      A     No.
2      Q     Are you seeking money damages at
3  all?
4      A     Yes, as part of the lawsuit.
5      Q     For what?
6      A     There's no requested amount.
7      Q     What do you think a fair number
8  would be?
9      A     I mean, honestly --
10     Q     And what -- what is it based on,
11 in your mind?
12           MR. KOHN:  You can answer.
13           THE WITNESS:  I mean,
14     realistically, what I went through was
15     horrible and so -- and it was horrible
16     for me and my friend.  He's a bearded
17     Saudi man being pulled over by shore
18     cops, young, untrained, trigger happy
19     shore cops.  If I could put a number on
20     that it would easily be double whatever
21     -- you know, whatever I could even
22     imagine for myself.  You know, his
23     trauma has also affected me.  It is
24     scary to be driving around with him.  It

Page 65

1  is scary to be driving around myself.
2      If you want me to put a number on it
3      I'll say 100,000.  You know, because
4      there's no number that's going to fix
5      all that stuff that has already
6      happened.
7           But you want to talk about how
8      scary it was and how traumatic it was.
9      You know, I'm grateful that I don't have
10     lasting therapy or that I didn't need to
11     change jobs or anything because of it,
12     but I'm not happy about it.
13 BY MR. JOHNSON:
14     Q     Do you know anyone else who's
15 been through a similar experience having been
16 arrested as a result of a courtesy tow?
17     A     Personally, no.
18     Q     Have you heard about anyone like
19 that?
20     A     No, but it was one of the things
21 on my mind when they told me to report my car
22 stolen because I did not want to be driving
23 around in a stolen vehicle.
24     Q     Did you ever -- did you ever

Page 66

1  find out why the tow had happened?
2      A     I believed it was because of
3  tree cutting work that they were doing.  I -- I
4  was able to figure that out myself because
5  eventually they did the other side of the
6  block.  They were doing tree cutting on that
7  side of the block and I happened to just look
8  up and notice that they had cut trees on my
9  side of the block.
10     Q     Do you know who actually towed
11 the car, was it PPA or was it a contractor?
12     A     It was ticketed by the City of
13 -- by Philadelphia Police, but I don't know if
14 it was the police or if it was a private tow
15 company that moved the car.
16     Q     Okay.
17           Do you have any social media
18 accounts?
19     A     Yes.
20     Q     Which platforms?
21     A     Facebook, Instagram, Snapchat.
22     Q     Did you post about this incident
23 on any of your social media?
24     A     No, I don't think so.

Page 67

```
 1        Q        Has your car ever been towed
 2   after this incident?
 3        A        It has actually.
 4        Q        What was -- what happened there?
 5        A        It was just parked in a loading
 6   zone so it was a normal PPA tow.
 7        Q        And what did you do as a result
 8   of that tow?
 9        A        I called PPA.  They told me
10   exactly where the car was and I was able to
11   recover it within an hour.
12        Q        Did you have to pay to get it
13   out?
14        A        Yes.
15        Q        Okay.
16                 Have you ever been the plaintiff
17   in a lawsuit before?
18        A        No.
19        Q        Have you ever been a defendant
20   in a lawsuit?
21        A        No.
22        Q        Have you ever been convicted of
23   a crime?
24        A        Nope.
```

Page 68

```
 1        Q        Have you ever been charged with
 2   a crime?
 3        A        No.
 4             MR. JOHNSON:  All right.  At this
 5        time can we take a brief recess?  I'm
 6        just going to look over my notes and
 7        talk to Shelly and let you know if I
 8        have a few more questions, but I think
 9        we're almost done.
10             MR. KOHN:  Great.  Sure.  Thanks.
11                 -  -  -
12             (Whereupon, there was a
13        brief recess.)
14                 -  -  -
15             MR. JOHNSON:  A few more
16        questions and I think we'll be done.
17   BY MR. JOHNSON:
18        Q        So if we go back to the time you
19   found your car, I believe it was February 13,
20   2020, when you found your car at the corner of
21   you said 43rd and Pine Street; is that right?
22        A        Yes.
23        Q        And was that in a legal parking
24   spot at the time?
```

Page 69

```
 1        A        No.
 2        Q        What was the classification of
 3   the spot it was in?
 4        A        It was, I'm pretty sure, a
 5   loading zone.
 6        Q        Are you aware was it a loading
 7   zone or was it two hour parking?
 8        A        I'm pretty sure it was a loading
 9   zone.
10        Q        Did you get a parking ticket as
11   a result of that?
12        A        The only ticket it had on it was
13   for the PPD towing ticket.  There was not a PPA
14   ticket for anything else.
15        Q        So it was not a parking
16   violation?
17        A        No.
18        Q        So the towing ticket, was there
19   a fine associated with that?
20        A        Yes.
21        Q        How much was that fine?
22        A        I think it was around $52.
23        Q        $52.00.
24                 Did you pay that?
```

Page 70

```
 1        A        Yes.
 2        Q        Did you ever file an appeal to
 3   that?
 4        A        No.
 5        Q        And after that, did you ever
 6   find any -- you know, back on your block on the
 7   4200 block of Chester, did you find any signage
 8   related to temporary parking restrictions on
 9   the block?
10        A        At some point, I don't remember
11   when exactly, I found on the ground one of
12   those red and white restricted temporary
13   parking signs, but it had been rained on.  It
14   was pretty tethered.  I don't think I could
15   even really read the dates on it.
16        Q        So when you found that, it was
17   -- you're saying it wasn't legible?
18        A        Correct.
19        Q        Did you -- do recall what day
20   that was?
21        A        No, I don't remember when I
22   found it.
23        Q        Was it within a week of finding
24   your car?
```

Exhibit C

## FW: Police complaint form



> **External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**



🏵️ Police complaint form

| | |
|---|---|
| Your name | Mary Henin |
| Mailing address: | Street Address: ███████████<br>Street Address Line 2: ██<br>City: Philadelphia<br>State / Province: PA<br>Postal / Zip Code: 19104 |
| Primary phone number: | ████████ |
| Primary email: | ████████ |
| Occupation (optional): | Attorney - Defender Association of Phila |
| Date of birth | ███████ |
| Gender: | ███████ |
| Ethnicity: | ███████ |
| Self-describe ethnicity: | ███████ |
| Do you have a disability? | ███████ |
| Did the incident involve a Philadelphia | Yes |

| | |
|---|---|
| Police Officer? | |
| Location of incident: | 4200 Chestnut St. |
| Date and time of incident: | February 2020 |
| Was the incident digitally recorded? | No |
| Were you arrested? | No |
| Are criminal charges pending? | No |
| Is there a Philadelphia Police report? | Yes |
| If yes, report/DC#: | 20-18-012854; 20-18-012949 |
| Please describe incident in detail: | Sometime in mid-February (sometime between February 5 and February 12, 2020), the city was cutting trees on my block and had posted restricted parking notices. I had missed the signs, and I did not move my car. I had last used my car on February 5, 2020. On February 12, 2020, I had given my key to my friend ████████ to borrow my car. When he arrived to 4200 Chester Ave, where I told him the car was parked, it wasn't there. I met him on the block, and the car was not there. I suspected that courtesy towing was a possibility because there was an old "restricted parking sign" on the ground. It had been rained on and torn, so I could not read the date on it. I called the 18th Police District to see if there had been any towing on 4200 Chester Ave. between February 5 and February 12. I spoke to several officers, all of whom said there was no record of my car being towed or of any towing occurring in 4200 Chester Ave in the last 2-4 weeks. The district officers all recommended that I report the car stolen. I explained that the car has Virginia plates and a push-button start, making it unlikely to be stolen. I asked if there was any other way to create a record for police to look for the vehicle without having to report it stolen. I feared finding the car and then being stopped in the future for driving my own car in stolen status. The district officers all told me that the only way to create a record of the car for police to find it is to report it stolen. They also said that if there was no record that the car had been towed, then it was likely stolen. I called 911 at about 10:30pm, and two 18th District officers responded. The recorder PO ████ (Badge ████) took the stolen car report. I did not get the name of her partner, the driver, but I remember that he was a man. I believe he was a Black officer. PO ████ filled out a |

stolen car report, with my name as the listed complainant. The DC
# for the stolen car report was 20-18-012854. PO ███ and her
partner recommended that I go out looking for the car myself in
case it was courtesy towed.

The next morning, February 13, 2020, I borrowed a friend's car and
drove around the neighborhood. I had met the friend before she
left for work, so it was around 8:30am. I found my car within 10
minutes. It was parked on the corner of 43rd and Pine Streets
(exactly 3 blocks from my house) in front of the Colonial Pizza. On
the windshield was a typed piece of paper warning that the car
needed to be moved and a ticket issued by the Philadelphia police
for parking in a restricted zone (about $50 - with fees the ticket was
$54.50). I called the 18th District again to report the car as found,
and they said I had to call 911 to file a new report. I called 911, and
PO ███ (Badge ███) took the report. The DC # for the found
report was 20-18-012949. When PO Stokes gave me my DC # and
reported the car as found, he told me that the car was not showing
up in stolen status. I asked him if that could be because the night
officers had not filed their paperwork yet. And he said yes, that was
most likely, and I should call the district to make sure the car is not
in stolen status. After about a week, I called the 18th District to
make sure the stolen car paperwork wasn't filed and my car was
not in stolen status. The district officer that I spoke to said the car
was not in stolen status.

On May 29, 2020, ████████ and I were driving in Long
Beach Island at the Jersey Shore. ███ was driving. We were
pulled over by 4 SUVs with tasers drawn. We were both ordered
out of the car with our hands up. We were both immediately
detained and handcuffed. ███ had his pockets searched. I let
the officers know that I was a lawyer. They told me we were being
pulled over because the car was showing up as stolen in NCIC. I
asked them from when, and they said "the first week of March."
That would have been 2.5 - 3 weeks after I reported the car as
stolen and 1.5-2 weeks after I called to verify that the stolen car
paperwork was not filed after the found paperwork. I explained the
situation to the LBI police and gave them the DC # for the found car
report, which I kept in my glove compartment. ███ and I were
handcuffed on the side of the road for 45 minutes while the LBI
police waited to hear verification from Philadelphia that the car
was not stolen. My car was searched and papers thrown around,
trashed. It was a terrifying and traumatizing situation. I am still
worried that it can happen again or anytime I drive the car if the
paperwork is still not straightened out properly. It is an enormous
waste of police resources. All of this could have been avoided if 2
things happened: 1) the 18th District kept proper documentation
on the courtesy towing that happened, especially considering they
had ticketed my car and should have had a record of the ticket; and
2) PO Geddy and her partner did not wait 3 weeks to file their
paperwork. Ma

Number of    2
Police
Officers:

Badge: ███████

Name: ██████

Sex: ████████

Race: ████████

Badge: ██

Name: █

Sex: ████████

Race: ████████

Number of witnesses: 2

Name: ██████████

Address: Street Address: ████████████
Street Address Line 2: ████████
City: Philadelphia
State / Province: PA
Postal / Zip Code: 19103

Phone Number: ██████

Name: ████████

Address: Street Address: ███████████

Phone Number: ███████

Signature of complainant

*Mary Howin*

Date: 06/01/2020

How did you hear about the Philadelphia Police Advisory Commission?    Referral

You can edit this submission and view all your submissions easily.

Exhibit D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


KATHLEEN EASTMAN; MARY HENIN:
AMANDA HAY and MATTHEW ALLEN,
individually and on behalf  :
Of all others similarly,
                          :
        Plaintiffs,
                          :
    vs.
                          :
THE CITY OF PHILADELPHIA,
                          :
        Defendant.              NO. 21-02248
                          :


-----
WEDNESDAY, OCTOBER 26, 2022
-----


        Oral deposition of MATTHEW WHITE held at the
Law Offices of Kohn, Swift & Graf, 1600 Market
Street, Philadelphia, Pennsylvania, commencing at
1:02 p.m., by and before Jo-Anne M. Bosler,
Professional Shorthand Reporter and Notary Public.


------


M A G N A L E G A L S E R V I C E S

(888) 624-6221

www.MagnaLS.com



1    connection to posted construction work
2    that was going to happen.
3        Q.  Is it fair to say that was used as
4    a shorthand way to describe the moving of
5    vehicles in connection with the types of
6    things you just mentioned?
7        A.  That's fair.
8        Q.  Was it used interchangeably at
9    times with relocation or relocation
10   towing?
11       A.  No.  Again, I think that's a term
12   that was used in the newspapers or used to
13   talk about moving cars.  None of these
14   things to my understanding were ever
15   programs in the police department in the
16   way that say another program would be
17   run -- like an official program.
18       Q.  It's your testimony that there was
19   no official program for relocating
20   vehicles that might be necessary at times?
21       A.  There's a policy to relocate
22   vehicles under the circumstances that we
23   discussed, such as parades or other events
24   or emergency situations or also when there

1    was construction going on in a given sign
2    and signs are posted.
3        Q.  And that was the policy of the
4    department?
5        A.  Yes.
6        Q.  And the department is part of the
7    City of Philadelphia; right?
8        A.  Yes.
9        Q.  Would you say that it was,
10   therefore, a policy of the City of
11   Philadelphia to relocate cars under
12   certain circumstances that you just
13   described?
14       A.  Again, it was a policy of the
15   police department to the extent that the
16   police department is a part of the city.
17   But as it's hard to answer for the larger
18   city when I was only inside the police
19   department.
20       Q.  And when you were talking about
21   those policies while you were working with
22   the city, would the term relocation or
23   relocating ever be used as a shorthand to
24   describe that cluster of circumstances

1    when cars were moved?
2        A.  Not that I can recall.  But I
3    believe we provided the directives -- when
4    where I policy I might use that word
5    interchangeably with directive, which the
6    police department is guided by -- I don't
7    know -- somewhere in the neighborhood of
8    200 directives.  And I believe at least
9    one or more of them touch on the towing of
10   vehicles.
11       Q.  Have you ever seen the term
12   courtesy towing in writing in police
13   department documents?
14       A.  Not that I can recall.
15           MR. KOHN:  Why don't we
16       mark this as the first exhibit
17       which would be White Exhibit
18       Number 1.  It's a three page
19       documents, I believe.
20           (Whereupon the document
21       was marked, for identification
22       purposes, as Exhibit White-1.)
23   BY MR. KOHN:
24       Q.  What is placed before you what has

1    been marked as White Exhibit Number 1.
2    And this is a three page document which
3    bears the production numbers in the lower
4    right-hand corner, City 00122, 123 and 124
5    produced to us in this litigation by the
6    city.
7        Have you ever seen this document
8    before?
9        A.  I may have.  This is a PAC
10   document -- Police Advisory Commission,
11   which I have seen may of in my time
12   working in the police department.
13       Q.  Do you recall seeing it in
14   connection any role you may have played in
15   this litigation, Eastman versus City of
16   Philadelphia?
17       A.  Can you rephrase the question.  I'm
18   sorry.
19       Q.  Have you -- do you recall ever
20   seeing this document with respect to
21   anything you may have done in connection
22   with this lawsuit, Eastman versus
23   Philadelphia, the reason why you're here
24   today?



1    A. Yes.
2    Q. Are there consequences if you do
3  not comply to the directives?
4    A. Yes.
5    Q. What kinds of consequences?
6    A. Formal discipline within the police
7  department can range anywhere from a
8  verbal reprimand up to dismissal from the
9  police department.
10    Q. These are not just sort of a
11  aspirational goals; these are something
12  that's more deep than that is.
13      Is that fair?
14    A. Yes.
15    Q. I'm going to mark this document as
16  Exhibit-3. These are Defendant's
17  Objections and Responses to Plaintiff's
18  First Set of Interrogatories. It's dated
19  June 10th, 2022.
20        (Whereupon the document
21        was marked, for identification
22        purposes, as Exhibit White-3.)
23  BY MR. KOHN:
24    Q. Have you ever seen the document

1  that's been marked as Exhibit-3 before
2  today?
3    A. Yes.
4    Q. When did you see it? When did you
5  last see it?
6    A. I last saw it an hour and some
7  change ago.
8    Q. When was the last time you saw it
9  before that?
10    A. Probably the date that I signed the
11  verification, which was June 10th.
12    Q. Looking at the question --
13  Interrogatory Number 1, on Page 4 and the
14  answer -- the second paragraph of the
15  answer refers to the Philadelphia police
16  department.
17      My question is, is that a full and
18  complete answer to Interrogatory Number 1
19  as it relates to the police department?
20    A. No.
21        THE COURT REPORTER: I'm
22      sorry. What was that?
23        THE WITNESS: No.
24

1  BY MR. KOHN:
2    Q. It is not a full and complete
3  answer?
4    A. Not to the extent that it asks to
5  identify management supervisory level or
6  higher employees.
7    Q. Did you endeavor to answer that
8  portion of the interrogatory when you were
9  doing your work before June 10th?
10    A. I would have say that would not be
11  possible to do, although -- without an
12  undue burden. There's so many supervisory
13  level people within the police department
14  that there's such a need to get a entire
15  roster of the police department.
16    Q. Who have responsibility for the
17  city's relocation of vehicles?
18    A. Any aspect of it?
19      Street supervisor in the police
20  department can ask to have a vehicle moved
21  if they thought it was necessary given
22  whatever events were unfolding on the
23  street.
24    Q. And the answer could have stated

1  that, couldn't it?
2    A. It's also asking about something
3  I'm not familiar with, which is -- it
4  appears to be a proper noun, in three
5  words, The City's Relocation Program.
6  That's not something that the city, to my
7  knowledge, engages in.
8      There's a wide variety of movement
9  of vehicles. I think we described the
10  circumstances under which we would do it.
11  But never was that formalized under
12  something called the City's Relocation
13  Program.
14    Q. But you understand that the
15  relocation of vehicles were done for
16  parades and special events -- which it
17  states in this answer; correct?
18    A. Yes.
19    Q. And you understood that when we
20  talked a few moments ago when I just asked
21  you generally about the term, "relocation
22  program."
23      So when you answered the
24  interrogatories you understood that that's



Exhibit E


| Issued Date: 06-12-15 | Effective Date: 06-12-15 | Updated Date: 11-15-21 |
|---|---|---|

**SUBJECT:   POLICE TOWING OF VEHICLES**
**PLEAC 1.2.3e**

---

1.    **POLICY**

    A.  The primary function(s) of the Police Tow Squad is the relocation or impoundment of vehicles for the following situations:

        1.  Vehicles relocated for parades, special events, major accidents, including tractor-trailers, and disabled vehicles which cause a hazardous situation.

        2.  Impoundment of vehicles involved with homicides, crime scenes, "Guard for Fingerprints" and investigations (major crimes, etc.).  Fatal accidents or accidents involving vehicle safety checks will be determined by the Accident Investigation District (AID).

        3.  All policies concerning the Towing of Recovered Stolen Vehicles will be followed as outlined in Directive 12.7, Appendix "B."

        **NOTE**:  All policies concerning the towing of police vehicles will be followed as outlined in Directive 9.8, "Maintenance, Servicing and Repair of Police Vehicles".

---

2.    **PROCEDURES**

    A.  Police Officer/Investigator seeking to tow a vehicle will:

        1.  Supply Police Radio with the following:

            a.  Location of the vehicle,
            b.  Make, model, color, and condition of vehicle,
            c.  State, license plate number, and vehicle identification number (VIN),
            d.  Specific reason for tow request,
            e.  Weight/cargo, if possible, of any **overturned** tractor-trailer and placard information of any hazardous cargo.

        2.  Complete a Complaint/Incident report (75-48) and a Vehicle/Pedestrian Investigation Report (75-48A) with pertinent information and give it to the Operations Room Supervisor.

City_00007

Exhibit F

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -


| | |
|---|---|
| KATHLEEN EASTMAN, MARY HENIN, | : CIVIL ACTION |
| AMANDA HAY, and MATTHEW ALLEN, | : Individually |
| and on behalf of | : |
| all others similarly situated | : |
| | : CLASS ACTION |
| vs. | : |
| | : |
| THE CITY OF PHILADELPHIA | : NO. 21-02248 |

- - -

Tuesday, October 11, 2022

- - -


Videoconference deposition of

LIEUTENANT MICHAEL ANDERSON, currently

located in Pennsylvania, taken pursuant to

notice, was held remotely via Zoom,

commencing at 9:13 a.m., on the above date,

before Lori A. Zabielski, a Registered

Professional Reporter and Notary Public in

and for the Commonwealth of Pennsylvania.


- - -

MAGNA LEGAL SERVICES
866.624.6221
www.MagnaLS.com



1      A.    The tow squad is consisting
2  of almost all civilian employees who are
3  tow truck operators or heavy-duty wrecker
4  operators.  We are responsible for towing
5  on guard for transfer evidentiary
6  vehicles into our headquarters or another
7  secure facility for investigations.  We
8  also coordinate with the City in response
9  to snow emergencies to tow cars off snow
10 emergency routes.  And we also do job
11 details throughout the City for other
12 special events, parades, foot races,
13 things like that, demonstrations.
14     Q.    And does the tow squad have
15 its own fleet of tow vehicles?
16     A.    Yes, we do.
17     Q.    Does the City -- or does the
18 tow squad ever use third-party tow truck,
19 private tow truck operators as part of
20 its work?
21     A.    We have a contract
22 currently.  It's with Rob's Towing for
23 heavy wrecker operations, something that
24 would require, like, a tractor trailer or

1  any other large-type vehicle like that
2  that would be beyond the scope of the
3  equipment that I have.
4      Q.    I see.
5           - - -
6           (Reporter clarification at
7  this time.)
8           - - -
9           THE WITNESS:  Rob's Towing.
10 BY MR. HOESE:
11     Q.    Lieutenant Anderson, have
12 you ever heard the expression "courtesy
13 towing"?
14     A.    I have only heard that
15 through news articles that people have
16 sent me.
17     Q.    Okay.  Do you use the term
18 "relocation" when the tow squad is doing
19 its work?
20     A.    Yeah, a relocation is
21 something that we would do when we are
22 not going to take it to an impound
23 facility or a secure facility for
24 evidence.  We would just relocate it.

1      Q.    Got it.  Got it.  Okay.
2  Well, let's start with, Lieutenant
3  Anderson, are you familiar with police
4  department Directive 12.5?
5      A.    Yes.
6      Q.    What is a police directive?
7      A.    It's a document that they've
8  created to use as a guide while
9  performing your duties as a police
10 officer.
11     Q.    Do you know who prepares the
12 police directives?
13     A.    Throughout the years, it's
14 been different departments.  It's changed
15 names.  However, they usually come up
16 with a policy and then send it out to
17 commanders for review, so it's created by
18 a -- I believe research and planning
19 right now, but it's sent out for, like I
20 said, review by all the commanders and
21 then recommendations are made and either
22 accepted and directed as change or they
23 discuss it and, you know, decide to go
24 the original way.

1  So I don't know if there is
2  one set person that writes a directive.
3  It's kind of a collaborative approach.
4      Q.    I see.  Okay.  All right.
5           MR. HOESE:  What I am going
6  to do is -- what I would like to
7  have marked as Anderson Exhibit-1
8  is police department direct -- or
9  Philadelphia Police Department
10 Directive 12.5.
11          - - -
12          (Anderson-1 marked for
13 identification at this time.)
14          - - -
15 BY MR. HOESE:
16     Q.    I was practicing this on
17 Friday.  Let me see if I can do it
18 properly today.  Well, all right.  Let's
19 try again.
20          MS. REINHART:  I was going
21 to say if you already have the
22 document open, then you should be
23 able to when you do screen share
24 select that particular one.



1      A.   I do not.
2      Q.   Then we have E, and it talks
3  about the operations room supervisor.
4           Do you see that?
5      A.   Yes.
6      Q.   All right.  And that's
7  different from the radio room supervisor,
8  correct, that person?
9      A.   That's correct.
10     Q.   And does he have anything to
11 do with relocation tows?
12     A.   No.
13     Q.   Okay.  All right.  What I am
14 looking for here, I think there is -- I
15 know there is a -- here we go.
16          I am going to scroll down
17 to -- and I hope you can see -- is a
18 sample of a Philadelphia Police
19 Department towing report.
20          Can you see that, Lieutenant
21 Anderson?
22     A.   I can see the top, yes.
23     Q.   All right.  Again, I think
24 you can adjust, too.  If there is

1  something else you want to see, you can
2  scroll, I think, down the whole document.
3  But is this one of the 75s we were
4  talking about earlier, the form numbers?
5      A.   Yes.  If you scroll towards
6  the bottom, I think you can see what form
7  number it is.  So that would be the 75-7.
8      Q.   Okay.  And does this form --
9  is this form filled out in connection
10 with relocation tows?
11     A.   This is generally filled out
12 for vehicles who are going to be towed as
13 part of the Live Stop program or I
14 believe the officer does this for a
15 vehicle being towed and it's evidentiary
16 as well but not for relocation.
17     Q.   Not for relocation.  Okay.
18          So this has the owner's
19 information on it.  Okay.  Okay.  This
20 was not for relocation tows.  Okay.
21          MS. REINHART:  If I may also
22          just note that the document that
23          we were just looking at at the
24          bottom is City_00016 just for the

1  record.
2           MR. HOESE:  Okay.  Thank
3      you.
4           MS. REINHART:  Thank you.
5  BY MR. HOESE:
6      Q.   All right.  Lieutenant
7  Anderson, I wanted to ask you a couple of
8  questions, and it may be only a couple,
9  about Appendix A to Directive 12.5.  And
10 the first one here is towing from private
11 lots and driveways.
12          Do you see that?
13     A.   Yes, I can.
14     Q.   And is it accurate to say
15 that the police department does not tow
16 vehicles from private lots and driveways;
17 is that right?
18     A.   That's correct.
19     Q.   All right.
20     A.   Unless it is a police
21 situation.
22     Q.   Okay.  So we see under 2:
23 Only licensed -- under 2:  City code
24 Section 9605 (11).  It has:  Only

1  licensed towing companies shall be
2  permitted to tow any illegally parked
3  vehicle from any licensed or unlicensed
4  parking lot, from private property, from
5  any common driveway and from in front of
6  any driveway where the vehicle is
7  blocking access to the driveway.  And
8  then it goes on.
9           But does the tow squad
10 oversee the operations of the licensed
11 towing companies when they are towing
12 from --
13     A.   No.
14     Q.   -- parking lots and so on?
15     A.   No, we don't.
16     Q.   You don't.  Okay.
17          Do you see under E here in
18 Appendix A, it has:  Prior to towing a
19 vehicle under this subsection of the City
20 Code, the towing company shall take a
21 digital photograph that clearly shows the
22 following, and it has the license plate,
23 the violation for which the vehicle is
24 being towed -- again, I am not reading it


MAGNA
LEGAL SERVICES

1    verbatim -- and posted sign identifying
2    the unauthorized parking -- excuse me --
3    the posted sign identifying that
4    unauthorized parking is prohibited.
5        Does the tow operator have
6    to provide that photograph to anyone at
7    the City as far as you know?
8        A.   They have to maintain it on
9    file, I believe, and then present it if
10   there is a question as to the accuracy of
11   the tow and what the violation was.
12       Q.   Okay.  If we go down a
13   little bit further, we have 4:  Private
14   Towing of Vehicles Parked Illegally on
15   Private Property.
16       And it has under A:  Private
17   towing operators may tow a vehicle
18   illegally parked on private property upon
19   compliance with all applicable provisions
20   set forth in this appendix.  And then 1
21   is:  Police supervisors will be called to
22   the scene of all disputes involving
23   towing operators and vehicle operators.
24       Is that the only, to your

1    knowledge, situation where the police
2    would be involved in this type of towing?
3       A.   I believe they have to -- if
4    it's blocking a driveway or in those
5    types of situations, the police have to
6    be called for a ticket to be written.
7    The police or some law enforcement
8    agency -- it could be, you know, Temple
9    police or University of Penn police or
10   SEPTA police, but some law enforcement
11   has to be called to write a ticket prior
12   to them even towing the vehicle.
13       Q.   I see.  Okay.  But these are
14   not relocation tows, right?  These are
15   illegally parked vehicles?
16       A.   Yes.
17       Q.   Okay.  And do you see under
18   B:  The police radio room supervisor will
19   ensure that:  Information received by
20   Police Radio from private towing
21   operators/dispatchers regarding vehicles
22   illegally parked on private property is
23   promptly entered into the PCIC Towed
24   Vehicle File?

1       A.   I see that.
2       Q.   All right.  And it has the
3    information which will include a location
4    removed from and location of storage,
5    make, model and color of the towed
6    vehicle, registration number, license,
7    and/or VIN, reason for towing the
8    vehicle, the name of the towing operator
9    and towing company, and registration
10   number of the towing vehicle.
11       Did you see that, Lieutenant
12   Anderson?
13       A.   I see all that.
14       Q.   All right.  And this part of
15   the directive is connected to when a
16   private tow operator is removing an
17   illegally parked vehicle from private
18   property, correct?
19       A.   Yes.
20       Q.   In this situation, though,
21   the tow operator is required apparently
22   at least under this directive to provide
23   all this information to the police radio,
24   correct?

1       A.   Correct.
2       Q.   And police radio is supposed
3    to input that into the system?
4       A.   Correct.
5       Q.   Okay.  And when it says A,
6    location removed from and location of
7    storage, is the location of storage, is
8    that to your understanding where the
9    vehicle has been taken?
10       A.   Yes.  In most situations,
11   they take it to their secure lot, and you
12   have to go retrieve your car from their
13   lot.
14       Q.   Got it.  Okay.  Is it --
15   does this type of information from the
16   private tow operators show up on the tow
17   folder?
18       A.   I believe so.  It should.
19       Q.   All right.  So on the tow
20   folder, there can be information about
21   relocated vehicles by the tow squad and
22   also vehicles that were towed by private
23   tow operators because they were illegally
24   parked on private property?



1　temporary no stopping signs, correct?
2　　　A.　Correct.
3　　　Q.　And the issue date of this
4　directive is May 27, 2009, same effective
5　date, and then updated 12/08/11.
6　　　　So take a look at this.  And
7　can you tell me what this directive is
8　designed to do?
9　　　A.　This directive is regarding
10　the temporary no stopping signs that are
11　posted for a variety of reasons and how
12　it's supposed to be handled when there
13　are violations.
14　　　Q.　And do you see the policy is
15　under 1:  A Parking Violation Reports
16　will not be issued to vehicles parked
17　prior to the posting of "Temporary No
18　Stopping" signs.
19　　　　Do you see that?
20　　　A.　Yes.
21　　　Q.　All right.  And the
22　temporary no stopping signs, what are
23　those?
24　　　A.　They are the white cardboard

1　signs.  They are probably 15 by 25 or
2　something like that that you see posted
3　generally with red that says temporary no
4　parking.  They are issued by the streets
5　department, utilized by streets, police,
6　water department.  They are also provided
7　for private events.  You know, if you are
8　having a moving truck coming and you can
9　apply for your streets department permit
10　to get the parking spots in front of your
11　house and then they will give you signs
12　to post.  There is a variety of reasons
13　why they get posted, but just to keep
14　people from parking in certain areas.
15　　　Q.　And you said that the
16　permits to obtain a temporary no stopping
17　sign are issued by the streets
18　department?
19　　　A.　That's correct.  In the case
20　of private, yes.
21　　　Q.　Private, right.  Okay.
22　　　A.　A private person without
23　going through that process obviously.
24　　　Q.　All right.  So the police

1　department also from time to time puts up
2　temporary no stopping signs; is that
3　right?
4　　　A.　Correct.
5　　　Q.　Is that the tow squad's job?
6　　　A.　No.
7　　　Q.　Okay.  All right.  Do you
8　have any idea how long before the
9　temporary no stopping is to go into
10　effect signs are supposed to be put up?
11　　　A.　I don't know that it's
12　specifically listed in here.  I believe
13　the general rule of thumb is always 48
14　hours, when possible.
15　　　Q.　Do you know if anyone in
16　connection with the private people who
17　obtain these, if anybody checks to see if
18　those signs are going up 48 hours in
19　advance?
20　　　A.　I do not know.
21　　　Q.　In connection with the
22　temporary no stopping -- I know you said
23　this, but I just want to clarify at least
24　in my mind -- this temporary no stopping

1　signs directive applies regardless of who
2　got the temporary -- or who put up the
3　temporary no stopping sign; is that
4　right?
5　　　A.　Yes.
6　　　Q.　Okay.  Meaning, I guess,
7　yeah -- you said that, but just meaning
8　that if I got one because I was moving
9　and needed a space for a moving van or
10　the police department put it up for some
11　reason or streets put it up?
12　　　A.　Well, I am only looking at
13　the first page here.  I don't know if
14　they changed anything since the last time
15　I looked at it.  But I believe this is
16　referring to all situations with no
17　parking -- temporary no parking signs.
18　　　Q.　Okay.  Great.  Thank you.
19　　　　Do you see under B:  Before
20　issuing a summons for violations of
21　"Temporary No Stopping" regulations,
22　police personnel will, and number 1 is:
23　Make every effort to locate owner?
24　　　　Do you see that?

MAGNA ＞
LEGAL SERVICES

1      A.   Yes, I do.
2      Q.   Can you tell me what goes
3  into those efforts?
4      A.   Generally, we run the tag or
5  the VIN number to locate the owner's
6  information.
7      Q.   And who within the police
8  department runs the VIN number?
9      A.   It would be whatever officer
10 is assigned out there prior to the
11 vehicle being towed.
12     Q.   Okay.  Does he have like a
13 computer with him that he can do that
14 while he is out on the street?
15     A.   As long as there's an MDC
16 assigned to the vehicle that they are in,
17 then they can just do it that way or they
18 can do it through police radio.
19     Q.   All right.  I see.  All
20 right.  By doing that, are you able to
21 obtain the -- can you obtain the name and
22 address of the owner of the vehicle?
23     A.   Yes.
24     Q.   Can you obtain a phone

1  number for the owner?
2      A.   No.
3      Q.   No.  Okay.
4           If the police officer is
5  able to find out the name and address of
6  the owner, what is the police officer
7  instructed to do after that?
8      A.   Well, if it's local enough,
9  they can go to the address and try and
10 get the owner to move the vehicle or they
11 can ask somebody else who might be closer
12 to do that.  However, very often, owners
13 are not local, and therefore we can't
14 really do anything with that information.
15     Q.   Is any -- do you try to find
16 a telephone number for the owners when
17 you find out their name and address?
18     A.   We generally really don't
19 have time to do that.
20     Q.   Okay.  Are any type of
21 written materials left at the residence
22 of the owner saying you have got to move
23 your car or it's going to get towed?
24     A.   Generally, at that point, if

1  they are not able to locate the owner or
2  there is no response, then the vehicle is
3  getting towed, so there is no point
4  leaving a message that they need to move
5  their car.  It's kind of at that
6  now-or-never point.
7      Q.   Would it be possible to
8  leave a message that says your car has
9  been towed?
10     A.   I guess they could.  But
11 they won't know where it's towed to yet,
12 so it's kind of a pointless message.
13     Q.   Okay.  And we will look at a
14 sign later, but the sign -- well, we will
15 wait until we look at the sign.
16          And No. 2, under B, do you
17 see the police officer is to contact the
18 district operations room supervisor or
19 ask and obtain a listing of all license
20 plate numbers of the vehicles parked at
21 the location prior to the posting of the
22 signs?  Do you see that?
23     A.   Yes.
24     Q.   So if the signs are supposed

1  to be posted 48 hours ahead of time, or
2  at least that was the common practice
3  that they were supposed to be, is a
4  police officer supposed to obtain the
5  listing more than 48 hours in advance --
6  excuse me -- more than 48 hours before
7  any towing would have to commence?
8      A.   I don't understand your
9  question.
10     Q.   Okay.  I think
11 understandably.  Let me try again.  I
12 appreciate you doing that.
13          2 says, under B2, that
14 police personnel will Contact the
15 District Operations Room Supervisor (ORS)
16 and obtain a listing of all license plate
17 numbers of the vehicles parked at the
18 location prior to the posting of the
19 signs, which I believe we can correctly
20 identify as the temporary no stopping
21 signs.
22          And my question is, does
23 that mean that 48 hours in advance of the
24 area becoming a temporary no stopping



1    THE WITNESS:  I have
2 received requests for documents
3 through the City several times for
4 various things, so I don't know if
5 it was for this particular case or
6 not.
7 BY MR. HOESE:
8    Q.   Okay.  What types of
9 documents were you asked for?
10    MS. REINHART:  Objection.
11    THE WITNESS:  Just usually
12 tow logs or tow reports.
13 BY MR. HOESE:
14    Q.   Were you able to find them
15 when you were asked for them?
16    A.   I believe I did, some of
17 them and others may have been either
18 outdated or they just couldn't be
19 located.  My facility is not the best, so
20 we have water damage problems sometimes,
21 so there may have been issues with that.
22    Q.   Lieutenant Anderson, when
23 the -- do you know whether or not before
24 the Philadelphia Parking Authority

1 tickets the vehicle, whether or not it
2 has the ability to check the tow file to
3 see if it's a relocated vehicle?
4    MS. REINHART:  Objection.
5    THE WITNESS:  I don't know
6 if they have the ability or not.
7    MR. HOESE:  Okay.  Well, I
8 appreciate your time today,
9 Lieutenant Anderson.  And I have
10 no further questions at this time.
11    MS. REINHART:  I have just a
12 few, if we have a couple more
13 minutes.
14    MR. HOESE:  We do.  I just
15 wanted to -- I paused.  But I
16 understand that we got an email,
17 Michelle, from your colleague
18 saying that some additional
19 documents have been located, I
20 think, perhaps with respect to tow
21 files.  So I do want to keep the
22 deposition open pending our review
23 of those documents.  So that's the
24 last thing I wanted to say.

1    MS. REINHART:  Okay.  Just
2 let us know what that review looks
3 like.
4    MR. HOESE:  Okay.  Will do.
5 Thanks again, Lieutenant Anderson.
6    THE WITNESS:  No problem.
7        - - -
8    EXAMINATION
9        - - -
10 BY MS. REINHART:
11    Q.   Lieutenant, I have just a
12 few questions for you.  First of all, is
13 there any way for you to know whether a
14 private tow company provides the City
15 with all the information needed in order
16 to collect information about any
17 relocations that they do?
18    A.   The only access I would have
19 to that information would be if it was
20 put into the tow folder.  But other than
21 that, I don't know if they comply on a
22 daily basis.
23    Q.   I believe earlier you
24 testified, and correct me if I'm wrong on

1 this, that when a private tow company
2 relocates a vehicle that a local police
3 officer is supposed to come out to, I
4 believe it was, write a ticket; was that
5 correct?
6    A.   That's correct.
7    Q.   Do you know whether private
8 tow companies always follow that process?
9    A.   I don't know for sure, no.
10    Q.   Do you know whether -- do
11 you know any examples of instances that
12 entities may call a private tow company
13 without calling the police -- the local
14 police district first?
15    A.   There are times where -- we
16 will use construction companies as an
17 example, that I am pretty sure that they
18 have relocated cars without necessarily
19 following all the directives as we are
20 supposed to follow.  So, you know, they
21 are trying to get their job done, and
22 they need a vehicle moved.  They are
23 going to not be as particular about
24 following all the rules as they should



1  be.
2      Q.   And I believe you said "I
3  believe" or something along that line.
4  It sounds like you don't know of specific
5  instances; it's more of a broad
6  understanding that this occurs?
7      A.   Yeah, yeah.  This would be
8  stories I have heard while discussing
9  things with different people in the
10  construction industry.  I don't have any
11  knowledge of a specific date or time that
12  it happened, no.
13      MS. REINHART:  I have no
14      further questions.  Thank you for
15      your time.
16      MR. HOESE:  Okay.  I just
17      have a couple follow-ups based on
18      your examination by Ms. Reinhart.
19          -  -  -
20      EXAMINATION
21          -  -  -
22  BY MR. HOESE:
23      Q.   Do you recall being
24  interviewed by someone at the Inquirer

1  about relocations, Lieutenant Anderson?
2      MS. REINHART:  Objection.
3      Just so I know, when are we
4      talking about?
5  BY MR. HOESE:
6      Q.   Well, Lieutenant Anderson,
7  have you read statements by yourself in
8  articles in The Philadelphia Inquirer
9  about relocation within the last two
10  years?
11      A.   I haven't read the articles,
12  no.
13      Q.   Okay.  Have you talked to
14  Philadelphia Inquirer reporters about
15  relocation?
16      A.   I was involved in a meeting
17  with the public informations officer and
18  reporters.  I am not sure what exact
19  publication they were with, but...
20      Q.   Okay.
21      MR. HOESE:  Let's bring up
22      another document.
23  BY MR. HOESE:
24      Q.   Okay.  Can you see this,

1  Lieutenant Anderson?  It's a printout of
2  an Inquirer article.
3      A.   Yes, I can.
4      Q.   All right.  It has
5  Borderline Illegal:  Courtesy Tows Remain
6  Philly's Persistent Parking Nightmare by
7  William Bender?
8      A.   Yes, I see it.
9      Q.   Do you remember speaking to
10  Mr. Bender?
11      MS. REINHART:  Objection.
12      You can answer.
13      THE WITNESS:  I remember,
14      like I said, being in that meeting
15      with Mr. Bender, I believe there
16      was somebody else there, and the
17      public information officer.
18  BY MR. HOESE:
19      Q.   Okay.  That's the public
20  information officer from the police
21  department?
22      A.   That's correct.
23      Q.   All right.  And we are
24  scrolling down here, and you see it has:

1  Passing the buck.  And then:  Lieutenant
2  Michael Anderson, head of the police
3  department's tow squad, said construction
4  companies that hire tow companies to
5  relocate cars could be partially to
6  blame.  He said a company supervisor is
7  supposed to keep a list of cars that had
8  been moved, but sometimes the
9  construction is completed by the time
10  vehicle owners realize their car is
11  missing.
12      And you are quoted as
13  saying:  There is no foreman to see,
14  Anderson said.  Those people have packed
15  up and moved to another location.
16      Do you remember telling that
17  to the reporter?
18      A.   Yes.
19      Q.   And that's essentially what
20  you just said in response to
21  Ms. Reinhart's question, correct?
22      MS. REINHART:  Objection.
23      You can answer.
24      THE WITNESS:  Yeah, that's



Exhibit G



**PHILADELPHIA POLICE DEPARTMENT    DIRECTIVE 3.7**

| Issued Date: 05-27-09 | Effective Date: 05-27-09 | Updated Date: 12-08-11 |
|---|---|---|

**SUBJECT: TEMPORARY NO STOPPING SIGNS**

---

## 1.    POLICY

A.  A Parking Violation Reports (PVRs) will not be issued to vehicles parked prior to the posting of "Temporary No Stopping" signs.

B.  Before issuing a summons for violations of "Temporary No Stopping" regulations, police personnel will:

   1.  Make every effort to locate owner.

   2.  Contact the District Operations Room Supervisor (ORS) and obtain a listing of all license plate numbers of the vehicles parked at the location prior to the posting of the signs.

       a.  If no owner can be located for these vehicles, they will be relocated by Tow Squad.

       b.  Tow Squad will notify police radio with the license plate number and location of the relocated vehicle.  Police Radio will enter the vehicle into the TOWE file.

   3.  Tow Away Zones are enforced twenty-four (24) hours a day unless otherwise specified.  Vehicles parked in Tow Away Zones will be issued a PVR and are subject to towing.

---

## 2.    PROCEDURE

A.  When the ORS is informed another department will post signs, or upon request to post signs, a Complaint or Incident Report (75-48) (No DC#'s required) will be prepared as follows:

   1.  "Complainant" block, insert the name of person, the department name and phone number of the unit requesting signs be posted.

   2.  "Description of Incident" block, insert the "Date and Time Enforcement Begins," "Date and Time Enforcement Terminates" and "Date and Time Signs Removed."

B.  PSA personnel will:

   1.  Post signs, when necessary.

**DIRECTIVE 3.7 - 1**

City_00004

# Exhibit H

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN EASTMAN, MARY       :
HENIN, AMANDA HAY, and       :
MATTHEW ALLEN,               :
individually, and on         :
behalf of all others         :
similarly situated,          : NO: 21-02248
                             :
            Plaintiffs,      :
      v.                     :
                             :
THE CITY OF PHILADELPHIA,    :
                             :
            Defendant.       :
                        -   -   -

Friday, October 7th, 2022

-   -   -

        Whereupon, the teleconference deposition of
STEPHEN LORENZ, took place pursuant to notice,
commencing at 1:00 p.m., on the above date, before
Krista Morici, a Professional Court Reporter and Notary
Public.

-   -   -

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



1    closure permit for construction."

2    A.    Yes, sir.

3    Q.    And it has:  "The Department of Streets

4    issues permits for street closures related to:"  And

5    it has a number of things under that, correct?

6    A.    Yes.

7    Q.    And it says:  Who -- if you scroll down a

8    little bit farther:  "Applicants must hold a

9    Contractor License or Commercial Activity License."

10   Do you see that?

11   A.    Yes.

12   Q.    So if I'm a contractor or someone who owns

13   a commercial activity licenses, do I use this

14   website to apply for a permit to close the street?

15   A.    Yes, sir.

16   Q.    And after I submit the application, what

17   happens?

18   A.    The application is reviewed and a permit

19   is issued to -- for the work to occur.

20   Q.    All right.  And there's a few attached to

21   this that we see at the bottom, correct?

22   A.    Yes, sir.

23   Q.    After the permit is issued, can you tell

24   me what happens then?

1    A.    If the permit is issued to the applicant

2    and the applicant schedules the work.

3    Q.    After the licenses is issued, does the

4    Street's Department have any more involvement with

5    the applicant?

6    A.    Only if the applicant reaches back out to

7    us needing an extension of their permit because they

8    did not complete the work for whatever reason.

9    Outside of that, no, we do not have any other

10   interaction.

11   Q.    Does the Street's Department -- well,

12   strike that.

13        In order -- Mr. Lorenz, are applicants

14   supposed to notify the public that the street is

15   going to be closed for a certain amount of time?

16   A.    It depends upon on the work that's being

17   done.

18   Q.    Okay.  And what cases would the

19   applicant -- would you expect the applicant would

20   notify the public that a street is going to be

21   closed?

22   A.    If it's a -- let's see, a large scale

23   public works project, or a capital improvement

24   project, where the street will be closed for

1    multiple days or weeks, if the work entails a

2    closure even for a day, they may or may not reach

3    out to the general folks on the block.  Outside of

4    that depending on the street that they are working

5    on, they may need police assistance to close off the

6    street, and then that work gets generated through

7    the block.

8    Q.    Does the Street's Department put up

9    temporary no-stopping signs?

10   A.    Yes, we do.

11   Q.    Do applicants come into your office to

12   obtain those, to put up --

13   A.    They can.

14   Q.    But they are not required to; is that

15   correct?

16   A.    They do not have to come into the

17   Municipal Service Building, they can also go to the

18   local police district.

19   Q.    Okay.  Now, I assume that it's -- that the

20   contractors request permits to close streets where

21   there's free parking?

22   A.    The type of parking does not make a

23   difference, if the work needs to occur, it doesn't

24   matter if it's free, metered, authorized, et cetera.

1    Q.    But before the street is closed, are you

2    aware of any requirements that the -- that the

3    permit holder notified people who are parked on the

4    street that there's going to be a temporary no

5    stopping area?

6    A.    The normal process is, they would post a

7    sign where they need to perform the work.

8    Q.    All right.  Whose responsibility would it

9    be to post the sign?

10   A.    The applicants.

11   Q.    Okay.  Does the Street's Department

12   monitor the applicants to see whether or not they

13   are putting up any signs to notify people?

14   A.    No, we do not.

15   Q.    Does the applicant have to provide any

16   kind of documentation that it did so?

17   A.    No, they do not.

18   Q.    Do you know what happens if there's a

19   street closure and there are vehicles parked on the

20   street at the time the work is to commence?

21   A.    That the cars need to be relocated or

22   removed from the street.

23   Q.    Does the Street's Department have any

24   involvement in actually removing cars in that



1  situation?
2  A.    If it's work that the Street's Department
3  is performing.
4  Q.    Okay.  But right now, if it's a
5  contractor, does the Street's Department have any
6  involvement in removing cars from the no stopping
7  area?
8  A.    No, we do not.
9  Q.    Do you know who takes responsibility for
10  removing the cars?
11  A.    It would be the subcontractor of the
12  applicant.
13  Q.    And the subcontractor -- excuse me.
14     Would the subcontractor be a towing
15  company?
16  A.    Usually.
17  Q.    All right.  Does -- if a towing company
18  subcontracted by a contractor tows cars from a
19  street that's temporarily closed, does the
20  contractor have to report to the Streets any
21  information about the vehicles that were towed?
22  A.    No, sir.
23  Q.    Does the tow operator have to report to
24  Streets any information about the vehicles that were

1  towed?
2  A.    No, sir.
3  Q.    Are you aware of any requirement that the
4  contractor or its subcontractor notify anybody about
5  the information about the vehicles that were towed?
6  A.    Yes, sir.
7  Q.    Okay.  What do you know about that?
8  A.    The process is when a vehicle is towed
9  the -- what we'll call it the tow list, which is
10  basically, you know, a piece of paper that says,
11  okay, blue Honda, license plate number, whatever,
12  you know, was towed from this address and relocated
13  to, you know, another address and that document is
14  provided to the local police district.
15  Q.    Okay.  So it's usually a contractor or a
16  subcontractor; is that right?
17  A.    It's usually the towing company that does
18  that.
19  Q.    Okay.  Do you know if there's a certain
20  amount of time within which they have to -- the
21  towing company has to provide that information to
22  the police district?
23  A.    It's either when they are done or by the
24  end of the shift.

1  Q.    Okay.  How long are the shifts usually?
2  A.    Depending on the job, six to eight hours.
3  Q.    Okay.  And there's are -- again, I know
4  you already said it, but I want to make sure.  These
5  are towing companies that are contracted with -- by
6  the contractors who got the street closure permit;
7  is that right?
8  A.    Yes, sir.
9             - - -
10     (Whereupon, Exhibit Lorenz-2 was
11  marked for identification.)
12             - - -
13  BY MR. HOESE:
14  Q.    I'm going to show you what's been marked
15  as Lorenz-2.  Mr. Lorenz, you mentioned that
16  temporary no stopping sign, and if you scroll down,
17  you can see the whole sign.
18  A.    Yes, sir.
19  Q.    Are these the no-stopping signs that the
20  Street's Department has printed?
21  A.    Yes.
22  Q.    And is there any information that's on the
23  back of this sign or is this it right here?
24  A.    Correct, that is it.  There's no

1  information on the back side.
2  Q.    Okay.  So who is responsible for filling
3  out the from and to on the top?
4  A.    The contractor.
5  Q.    And do you see at the bottom, it says,
6  authorized by?
7  A.    Yes, sir.
8  Q.    Do you put anything down there?
9  A.    The contractor, and there's no set rule as
10  to what is written down there, but depending on the
11  contractor, they may handwrite in there police, the
12  might just write the word permit, they may put the
13  permit number of there.  Some of them actually put
14  my name on the bottom of it.  Mine is on the bottom
15  of the permit.  It's unusual when I drive around and
16  I see my name, you know, at the bottom of a
17  temporary parking sign, but that's life in the big
18  city.
19     So the more conscientious or -- I'll use
20  the word experienced contractors may actually put at
21  the bottom of it where it says, "authorized," the
22  reason why.  And it's usually the foreman that does
23  that, so they may actually, you know, right on there
24  plumbing work, or resurfacing, or something along

