IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHLEEN EASTMAN, *et al.*, | : CIVIL ACTION |
| *Plaintiffs*, | : |
| v. | : NO. 21-2248 |
| CITY OF PHILADELPHIA, | : |
| *Defendant.* | : |

**MEMORANDUM OPINION**

**Goldberg, J.**                                                                                              December 5, 2024

      Plaintiffs Kathleen Eastman and Mary Henin, both Philadelphia residents, contend that Defendant, the City of Philadelphia ("the City") maintains an unofficial policy of relocating or authorizing the relocation of vehicles from legal parking spots. Plaintiffs claim that these "courtesy tows" are unconstitutional in that they lack adequate pre and/or post property deprivation notice, and that many of the spots to which the vehicles are towed are illegal or timed spaces. As a result, Plaintiffs assert that they, and others similarly situated, were unable to locate their vehicles with resulting negative consequences. Plaintiffs bring this putative class action alleging claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments.

      The City now moves for summary judgment contending that Plaintiffs have provided no evidence it was involved in the towing of their vehicles and that Plaintiffs suffered no harm as a result of the City's actions. For the following reasons I find that a genuine issue of material fact exists and will deny the City's Motion.[1]

---

[1] The identical "courtesy tow" policy has been challenged by fifteen other plaintiffs in a related case, Smith v. City of Philadelphia, No. 22-cv-5092 (filed Dec. 21, 2022). That matter is still at the pleading stage and currently has a motion to dismiss pending.

1

I.  STATEMENT OF FACTS

The following facts are derived from the evidence submitted by the parties. Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to Plaintiffs.[2]

A. **The City of Philadelphia's Towing Policies**

The City maintains no official "relocation program" or "courtesy tow" process for towing cars. (Def.'s Ex. D, Dep. of Matthew White ("White Dep."), 10:8–17, 33:2–13.) Nonetheless, Departments of the City, operating pursuant to their police powers, the City Charter, and state law do allow for vehicles that are inoperable or abandoned, unlawfully parked, impeding construction or other work on a street, or otherwise in a prohibited location to be towed and relocated. (Pls.' Ex. M, Response to Request for Admission No. 1; Pls.' Ex. A, Dep. of Stephen Lorenz ("Lorenz Dep."), 33:12–34:11.) For example, vehicles might be towed in the case of parades, special events, major accidents, or when they are located in spots that are designated as temporarily unavailable for parking. (DSUF ¶¶ 25–26; PR ¶¶ 25–26; Lorenz Dep. 32:1–12.)

There are three ways in which vehicles are relocated: (1) by or at the direction of the Philadelphia Police Department ("PPD"); (2) by towing companies under contract with the City; or (3) pursuant to a temporary no parking sign obtained from the City. (PSUF ¶ 2; DR ¶ 2.)

The PPD Tow Squad is responsible for towing vehicles when there are special events, parades, and demonstrations. (PSUF ¶ 3; DR ¶ 3.) PPD Directive 3.7 states in part:

> A. Parking Violations Reports [] will not be issued to vehicles parked prior to the posting of "Temporary No Stopping" signs.

---

[2] References to the parties' pleadings will be made as follows: Defendant's Statement of Undisputed Facts ("DSUF"), Plaintiffs' Response ("PR"), Plaintiffs' Counterstatement of Undisputed Facts ("PSUF"), and Defendant's Response ("DR"). To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions. If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits. If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute. I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

  B. Before issuing a summons for violations of "Temporary No Stopping" regulations, police personnel will:

    1. Make every effort to locate owner.

    2. Contact the District Operations Room Supervisor [] and obtain a listing of all license plate numbers of the vehicles parked at the location prior to the posting of the signs.

      a. If no owner can be located for these vehicles, they will be relocated by Tow Squad.

      b. Tow Squad will notify police radio with the license number and location of the relocated vehicle. Police Radio will enter the vehicle into the "TOWE" file.

    3. Tow Away Zones are enforced twenty-four (24) hours a day unless otherwise specified. Vehicles parked in Tow Away Zones will be issued a [Parking Violations Report] and are subject to towing.

(Pls.' Ex. L.)

When relocating cars, the PPD often directs the Philadelphia Parking Authority ("Parking Authority") to tow vehicles. (Pls.' Ex. D, Dep. of Anthony Kuzcynski ("Kuzcynski Dep."), 10:6–23, 13:15–24.) Under this process, the police place an incident form on a vehicle, contact the Parking Authority's radio room, ask for a tow unit to be sent to the location, and provide the radio room with the location from which they need vehicles relocated. The Communications Department then dispatches an available Parking Authority tow truck, which takes the vehicle information, enters the information into a handheld device, and then relocates the vehicle to a legal parking spot. (Id. at 14:10–15:7.) PPD does not require the Parking Authority to contact vehicle owners before a tow, and, if there is a gas leak or water main break, the Parking Authority tows vehicles even if they do not have incident reports on them. (PSUF ¶ 10; DR ¶ 10.)

Towing companies under contract with the City may also relocate vehicles. Streets Department contractors receive temporary no parking signs from the City and post them when doing road work or construction. (PSUF ¶ 11; DR ¶ 11.) A Streets Department inspector then determines whether any vehicles in the temporary no parking zones should be relocated and contacts the City's towing contractor

3

to relocate the vehicle. (PSUF ¶ 12; DR ¶ 12.) The City's towing contract specifies that the contractor should relocate vehicles to legal sparking spots nearby. (PSUF ¶ 13; DR ¶ 13.) The Streets Department does not do anything to monitor whether the contractor complies with this edict, but if the contractor parks the vehicle in an illegal spot and the vehicle is ticketed, it is the contractor that is responsible for those fines and penalties. (Lorenz Dep. 48:16–49:8.) The Streets Department's contractor is supposed to fill out a slip at the completion of a tow, detailing the make and model of a vehicle and the locations from where and to where it was towed. This slip is then supposed to go to the PPD. (PSUF ¶ 15; DR ¶ 15.) The City, through the Streets Department, does not maintain records of these tows. (Id.)

Finally, private contractors and residents can apply for and obtain temporary no parking signs from the Streets Department office or at the local police district, and those signs should be posted twenty-four to forty-eight hours before going into effect. (PSUF ¶ 17; DR ¶ 17.) The Streets Department does not require or check whether these signs are actually posted. (PSUF ¶¶ 18–19; DR. ¶¶ 18–19.) If a private contractor is performing work, the Streets Department does not have any involvement in removing cars from the no stopping area, and the contractor either calls the PPD to initiate the tow or hires a private towing company. (PSUF ¶¶ 20–21; DR ¶¶ 20–21.)

After a vehicle is relocated by the PPD, the Parking Authority, or a private tow company, the towing entity must contact the local police district to provide information identifying the vehicle, the location the vehicle was originally parked, and the location where the vehicle was moved. (DSUF ¶ 28; PR ¶ 28.) When a private tow company relocates a vehicle pursuant to a temporary no parking sign, a local police officer is required to come out to write a ticket. But there are times when, for example, construction companies may have cars relocated without following all the requisite directives. (Def.'s Ex. F, Dep. of Lt. Michael Anderson ("Anderson Dep."), 104:23–106:12.) When the City relocates a vehicle, it is the responding officer's responsibility to look up the owner's address prior to ordering the tow. If the address is local, the officer is required to go to the address and attempt to have the owner

4

move the vehicle. If the address is not local or no one responds, the tow is ordered. (Anderson Dep. 54:2–56:6.) Officers do not generally have access to an owner's phone number. (Id. at 54:24–55:2.)

### B. The City's Tow Logs

All vehicle tow information is supposed to be reported to PPD. (PSUF ¶ 22; DR ¶ 22.) The City, through local police districts, maintains a log of vehicles towed and relocated by the City and private tow entities called "the tow list," which states the type of car, license place number, place towed from, and place relocated to. (Lorenz Dep. 15:3–24.) The City, however, does not know if private tow companies always comply with this requirement. (Anderson Dep. 104:11–22.) There is no specific timeline for entry of information about towed vehicles into the tow file. (Id. at 82:21–83:2.)

The failure of independent towing companies to report their tows to the PPD has resulted in a lack of records about many of the courtesy tows. For example, Rob's Towing Company, the Streets Department's primary and exclusive towing contractor for the past ten to fifteen years, has only thirteen listed relocations in the City's town logs from the years 2016 to 2021. (PSUF ¶ 28; DR ¶ 28; Pl.'s Ex. N.) If there is no information on a relocated car in the tow file, the owners are directed to report a stolen vehicle. (Pls.' Ex. J., Dep. of Vanessa Curry ("Curry Dep."), 146:12–147:16.) There is no information in the City's tow logs of the Plaintiffs' vehicles being towed or relocated on or about the dates claimed in the Complaint. (DSUF ¶ 34; PR ¶ 34.)

### C. The Courtesy Tow of Plaintiff Mary Henin's Vehicle

Plaintiff Mary Henin's vehicle was registered to her mother in Virginia, but she drove it and is an authorized user under the vehicle's insurance policy. (PSUF ¶ 33; DR ¶ 33.) Henin alone paid for the vehicle's maintenance, inspection, and registration, and drove to Virginia every year to get her car inspected. (PSUF ¶ 34; DR ¶ 34.) Her insurance company was aware that she drove and kept her car in Philadelphia, and she made sure to park it in legal parking spots in her neighborhood. (PSUF ¶¶ 35–36; DR ¶¶ 35–36.)

5

After work on February 5, 2020, Henin parked her car in a legal parking spot near her home. (PSUF ¶ 37; DR ¶ 37.) There were no temporary "no parking" signs posted in the area where she parked. (PSUF ¶ 38; DR ¶ 38.) Nor did Hemin observe any street or utility work occurring in the area when she parked her car or in the days that followed. (PSUF ¶ 39; DR ¶ 39.)

On February 12, 2020, Henin's friend was given permission to borrow the car and informed Henin that it could not be located. (PSUF ¶ 40; DR ¶ 40.) Henin suspected the City courtesy towed her vehicle and called the 18th Police District several times for information. (PSUF ¶ 41; DR ¶ 41.) Henin testified that officers instructed her to call the Parking Authority or report her vehicle stolen. (PSUF ¶ 42; DR ¶ 42.) She stated that when she called the Parking Authority, she was informed that there was no record that the vehicle was towed, and, as such, she called 911 and reported the car stolen. (PSUF ¶ 43; DR ¶ 43.)

The following day, Hemin searched for the car in her neighborhood and found it two to three blocks from her house. (PSUF ¶ 44; DR ¶ 44.) The car had been towed to a loading zone and had a fifty-two dollar, PPD-issued ticket on it. (PSUF ¶ 45; DR ¶ 45.) Henin paid the ticket and contacted the 18th District to explain that she found her car and needed the "stolen status" removed. (PSUF ¶¶ 46–47; DR ¶¶ 46–47.) Henin believed that her vehicle might have been courtesy towed due to tree cutting work that she later observed in the area. (PSUF ¶ 49; DR ¶ 49.) Approximately a week later, Henin saw a tattered, illegible temporary no parking sign on the ground near where she originally parked the car. (PSUF ¶ 50; DR ¶ 50.)

On May 29, 2020, Henin was arrested at gunpoint while driving her vehicle in New Jersey. (PSUF ¶ 51; DR ¶ 51.) The officers who detained her informed her that her vehicle was still listed by PPD as stolen. (PSUF ¶ 52; DR ¶ 52.) The City admitted that its failure to maintain adequate records caused Henin's vehicle to remain in "stolen status" after the courtesy tow. (PSUF ¶ 53; DR ¶ 53.)

In a complaint form to the PPD, Henin stated that she knew, sometime between February 5 and February 12, 2020, that the City was cutting trees on her block and had posted restricted parking notices. She claimed that she had "missed the signs" and failed to move her car. (Def.'s Ex. C.)

### D. The Courtesy Tow of Plaintiff Kathleen Eastman's Vehicle

Plaintiff Kathleen Eastman regularly parked her vehicle in her Old City neighborhood where she had a Zone 10 parking permit. (PSUF ¶¶ 1, 54; DR ¶¶ 1, 54.) Residential parking in Old City is difficult due to the numerous restricted parking spaces and high demand. (DSUF ¶ 2; PR ¶2.) Eastman described the Parking Authority as "very active" in her area, with regular towings. (DSUF ¶ 3; PR ¶ 3.)

On November 9, 2020, Eastman parked her car in a legal Zone 10 spot near her home. (PSUF ¶ 55; DR ¶ 55.) At that time, there were no temporary no parking signs posted. (PSUF ¶ 56; DR ¶ 56.) Eastman testified that she knew building and street work had occurred throughout the summer in that area, and she was cognizant of the placement of temporary no parking signs. (Pls.' Ex. G, Dep. of Kathleen Eastman ("Eastman Dep."), 38:3–19.) The following Saturday, November 14, 2019, Eastman went to use her car and it was gone. (PSUF ¶ 57; DR ¶ 57.) Eastman believed her car had been courtesy towed due to a previous experience. (PSUF ¶ 58; DR ¶ 58.) She contacted the Sixth Police District, and the desk sergeant told her that her car had been towed to the 100-block of Water Street. (Eastman Dep. 31: 6–14.) Eastman's son then drove her to Water Street to find her car. When she could not locate it on Water Street, she called back, and the desk sergeant reached out to the towing company to see if they had any records, which they did not. (Id. at 32:15–21.) The officer encouraged her to report her car stolen if she could not locate it. (PSUF ¶ 63; DR ¶ 63.)

On her way home, Eastman's son spotted her car at a metered spot at Third and Arch Streets with three tickets on the windshield, issued on separate days. (PSUF ¶¶ 64–65; DR ¶¶ 64–65.) Eastman unsuccessfully appealed the tickets and ultimately paid them, totaling $330. (PSUF ¶ 66; DR ¶ 66; DSUF ¶¶ 12–13; PR ¶¶ 12–13.)

7

The Parking Authority told Eastman that there were several towing companies licensed by the City that might have towed the car. (PSUF ¶ 67; DR ¶ 67.) Of those, Eastman contacted five, all of which denied towing her vehicle. (Eastman Dep. 42:7–43:5, 59:10–60:2.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue. Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015). The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Summary judgment is appropriate if the non-moving party provides merely colorable, conclusory or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252. Unsubstantiated arguments made in briefs are not considered

evidence of asserted facts. Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993). Moreover, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 241 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

### III.    DISCUSSION

Plaintiffs contend that the City's involvement in the courtesy tows resulted in violations of their Fourth and Fourteenth Amendment rights, which are actionable pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002).

"[A] government entity may not be held vicariously liable under § 1983 for the acts of its employees under a *respondeat superior* theory of liability." Win & Son, Inc., 162 F. Supp. 3d 449, 459 (E.D. Pa. 2016) (citing Monell v. Dept. of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978)). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694; see also Mulholland v. Cnty. of Berks, 706 F.3d 227, 237 (3d Cir. 2013) ("When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or

executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." (quotation marks omitted)). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986) (emphasis in original).

Here, Plaintiffs asserts that the City's policy, practice, and custom of relocating vehicles, without adequate safeguards against arbitrary towing, deprived them of their possessory interests in their vehicles in violation of the Fourth Amendment. Plaintiffs also allege that, by failing to provide Plaintiffs with adequate notice that their vehicles would be or had been towed, the City violated their Fourteenth Amendment due process rights. (Compl. ¶¶ 47–51.)

The City responds that Plaintiffs' claims are deficient on two grounds: (1) failure to establish that the vehicle tows occurred pursuant to any City policy, and (2) failure to prove that there was insufficient pre- or post-deprivation notice.

### A. Whether the Vehicle Tows Were as a Result of the City's Policy

The City first avers that there is no evidence to submit to a fact finder that it was involved in towing or relocating Plaintiffs' vehicles. The City notes that the crux of Plaintiffs' Fourth and Fourteenth Amendment claims is that, as a governmental entity, the City interfered with Plaintiffs' possessory rights to their vehicles. According to the City, however, Plaintiffs have not developed any evidence to establish that it was involved in moving their vehicles. As such, the City urges that there was no action taken "under color of state law" as required for a § 1983 claim.

As set forth above, to succeed on constitutional claims under Monell, a plaintiff must: "(1) identify a policy, practice, or custom, (2) attribute it to the city, and (3) show a causal link between execution of the policy and the injury suffered." Win & Son, 162 F. Supp. 3d at 459 (quoting Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984). The policy or custom must be the "moving force" behind the plaintiff's alleged injury. Bd of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

10

The existence of an unconstitutional custom or practice may be established by a municipality's admissions in discovery. Am. Honda Fin. Corp. v. Twp. of Aston, 546 F. Supp. 3d 371, 383 (E.D. Pa. 2021).

The City acknowledges that there are three ways in which the vehicles were relocated: (1) by or at the direction of the Philadelphia Police Department ("PPD"); (2) by towing companies under contract with the City; or (3) after a private party obtains a temporary no parking sign from the City. Although Plaintiffs have not established exactly which of these scenarios resulted in the tows of either Henin's or Eastman's vehicles, sufficient facts exist connecting each scenario to the City.

First, to the extent the vehicles were towed by or at the direction of the Philadelphia Police Department, pursuant to PPD Directive 3.7, there is no question of fact that the actions were done under color of state law. The City does not dispute that the PPD is a municiple entity. While the tows in question are often completed by the Parking Authority, whose acts are not generally attributable to the City,[3] under the circumstances of this case, the Parking Authority was contacted by and acted under direction of the PPD. Therefore, whether towed by or under the PPD's authority, the City is sufficiently connected to the towing to satisfy the requirements of § 1983.

Second, to the extent the vehicles were towed by companies acting under contract with the City, the towing company is a state actor by virtue of maintaining an ongoing salvor relationship and contract with the City. Foster v. City of Phila, No. 12-cv-5851, 2014 WL 5821278, at *22 (E.D. Pa. Nov. 10, 2014). A salvor is generally considered to be a private business that tows cars on behalf of a municipality. Id. at *4. Nonetheless, "a private towing company acting at the behest of a police officer and pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws, acts under color of state law for purposes of section 1983." Id. (quoting Goichman v. Rheuban Motors, Inc.,

---

[3] See City of Philadelphia v. Phila Parking Auth., 798 A.2d 161 (Pa. 2002) ("in light of Act 22's transfer of control of the governing board (Board) of the Philadelphia Parking Authority (PPA) from the Mayor of Philadelphia to the Governor, PPA constitutes part of the Commonwealth government for purposes of the Commonwealth Court's original jurisdiction").

11

682 F.2d 1320, 1322 (9th Cir. 1982)). Here, the undisputed facts reflect that towing companies act under express direction from the City, generally after a Streets Department inspector contacts the City's towing contractor to relocate the vehicle. The purpose of these tows is to enforce the City's traffic decisions, and as such these tows are sufficiently connected to the city such that they can be deemed to have been carried out under color of state law.

Finally, to the extent the vehicles were towed by a private party pursuant to a temporary no parking sign, I find that Plaintiffs have sufficiently established a connection to the City. Conduct may be fairly attributable to the state where a symbiotic relationship existed between the state and a private actor. Crissman v. Dover Downs Entm't. Inc., 289 F.3d 231, 240–41 (3d Cir. 2002). A "symbiotic relationship" may exists when there is a great degree of interdependence between the state and the alleged wrongdoer. Klavan v. Crozer–Chester Medical Ctr., 60 F. Supp. 2d 436, 441 (E.D. Pa. 1999). A private party will be deemed a state actor if "the State has so far insinuated itself into a position of interdependence [with the private party] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." Id. at 441–42 (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961)).

Here, Plaintiffs have produced evidence that private contractors and residents apply for and obtain temporary no parking signs from the City, through the local police district. These temporary no parking signs contain the words "Temporary Police Regulation," "Vehicles Will be Towed," and "City of Philadelphia." (Pl.'s Ex. I.) The City's policy requires posting of the signs twenty-four to forty-eight hours prior to commencement of work, but the City does not check whether these signs are timely posted. (PSUF ¶¶ 18–19; DR. ¶¶ 18–19.) Although the private contractor may hire a private towing company to relocate the vehicle in a temporary no parking area, the contractor is only empowered to do so under the City's police authority and its policies. Additionally, the contractor, continues to be subject to City regulations regarding the tow. Based on this evidence, the City and the private entities can be deemed

12

to be in a symbiotic relationship, such that the private entities are jointly participating in state action. That the private entities may have failed to comply with the City's mandates, does not sever the symbiotic relationship between the two. In summary, the City has not pointed to any evidence suggesting that the vehicles in question were moved by some other person or entity for some other reason. Thus, a factual dispute exists that the Plaintiffs' vehicles were towed through one of the three previously addressed scenarios, each of which constitutes actions carried out under the City's authority.

### B. Whether Plaintiffs Received Adequate Notice

Alternatively, the City argues that even if there was evidence that it was involved in the tows of Plaintiffs' vehicles, Plaintiffs' claims of constitutional harm from insufficient pre- or post-deprivation notice still fail.

The Due Process Clause of the Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To establish such a procedural due process violation, a plaintiff must allege that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (quotation marks and citation omitted). "A fundamental requirement of due process is the opportunity to be heard . . . at a meaningful time and in a meaningful manner." Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008). A state provides adequate procedural due process "when it provides reasonable remedies to rectify a legal error by a local administrative body." DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 597 (3d Cir. 1995), abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392 (3d Cir. 2003). A procedural due process violation does not occur when a governmental actor provides adequate procedural remedies and the plaintiff does not avail himself of those remedies. Abernathy v. City of Pittsburgh, 795 F. App'x 85, 87 (3d Cir. 2020).

Absent an "extraordinary situation," "prior notice and a hearing" are the bedrock requirements of due process. United States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993). These must be provided "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965). "If pre-deprivation process is impracticable, then 'prompt post-[deprivation] notice and a hearing' must be provided." Am. Honda Fin. Corp. v. Twp. of Aston, 546 F. Supp. 3d 371, 378 (E.D. Pa. 2021) (quoting Propert v. District of Columbia, 948 F.2d 1327, 1332 (D.C. Cir. 1991)). In the context of towing, post-deprivation hearings have been found to satisfy due process even where a plaintiff was not provided a pre-deprivation hearing. See Shipley v. Orndoff, 491 F. Supp. 2d 498, 507–08 (D. Del. 2007) (citing cases).

Because of the apparent "necessity of quick action" and the impracticality of providing pre-deprivation process before towing a vehicle, a pre-deprivation hearing is not required, and an adequate post-deprivation remedy under Pennsylvania law satisfies due process. Abernathy, 795 F. App'x at 87. Nonetheless, where a municipality seizes a vehicle under an established policy and fails to provide either pre- or post-deprivation notice, a plaintiff may maintain a Monell claim. HVT, Inc. v. Port Auth. of N.Y. and N.J., No. 15-cv-5867, 2018 WL 3134414, at *4, *10–11 (E.D.N.Y. Feb. 15, 2018) (holding that where is car is towed pursuant to municipal policy, notice must be sent to titled owners, registered owners, and record lienholders of the seized vehicles promptly after the seizure).

Here, the City contends that Plaintiffs' claims of constitutional harm from insufficient notice fail on three grounds. First, it asserts that Plaintiffs were "likely" provided pre-deprivation notice for construction or work events. (Def.'s Mem. Supp. Summ. J. 7.) The City notes that its applicable rules require that temporary no parking signs be posted forty-eight hours prior to a potential towing event. The City then cites to Plaintiff Henin's testimony that she found a temporary no parking sign on the ground indicating there would be tree cutting on the block where she parked. It also cites to Plaintiff Eastman's testimony that she remembered active construction on the block where she parked. Both

Plaintiffs acknowledged that they did not check their vehicles for multiple days before realizing their vehicles were moved.

The City's counter facts are insufficient to warrant granting summary judgment. The City's argument relies on speculation of what might have been without citing to any specific evidence, and the City does not dispute Plaintiffs' testimony that, at the time they parked their cars, there were no temporary no parking signs posted. Henin did not observe any street or utility work occurring when she parked. Although she admitted that she learned, sometime after parking her car, that the City was going to begin cutting trees on her block, she testified that she only learned of that fact after she could not locate her car and saw only a tattered temporary no parking sign on the ground a full week after her vehicle tow. Similarly, although Eastman knew that building and street work had occurred in her area the previous summer, there were no temporary no parking signs at the time she parked. Moreover, the City's insistence that the presence of construction equipment and tattered street signs are sufficient notice is undermined by PPD Directive 3.7, which requires police officers "make every effort to locate [the] owner" when relocating a car. (Pls.' Ex. L.)

The City also contends that there is no evidence that it received any information about the towing of Plaintiffs' vehicles. It argues that neither Plaintiff has produced evidence showing that the PPD or the Parking Authority authorized the tow, and, to the extent the tow was carried out by a private contractor pursuant to a temporary no parking sign issued by the City, there is no evidence that the City was informed of the relocations.

I find no merit to this argument. The City admits that after a vehicle is relocated by private tow companies—acting under the authority of a temporary no parking sign issued by the City—the towing entity must contact the local police district to provide information about identifying details of the vehicle, the location the vehicle was originally parked, and the location where the vehicle was moved. When a private tow company relocates a vehicle, a local police officer is required to write a ticket. Through its local police district, the City must then maintain a log of vehicles—*i.e.*, the "tow list"— relocated by

15

either the City or private contractors acting pursuant to the City's authority. Although the City does not know if private tow companies always comply with this requirement, the City's inability or failure to enforce its own regulations and maintain accurate records is not a reason to avoid having a fact finder determine whether adequate post-deprivation notice was provided. To hold otherwise would require Plaintiffs to point to information that rests solely in the hands of the City.

Finally, the City argues that Plaintiff Henin cannot establish that she was denied post-deprivation notice because her vehicle was owned by her mother and any such notice would have been mailed to her mother's home address in Virginia. The City contends that "[i]t would be pure speculation whether the out-of-state vehicle owner would have received that notification before Plaintiff Henin discovered the vehicle was missing. This is especially true as there are no records indicating when the vehicle was moved, only when Henin discovered it was moved." (Def.'s Mem. Supp. Summ. J. 8.)

As the moving party, the City is obligated to offer evidence that post-deprivation notice was in fact provided to Henin's mother in Virginia, and it has failed to do so. The City also makes the faulty assumption that had it mailed notice to Henin's mother in Virginia, Henin would not have received it in time to move her car.

## IV. CONCLUSION

Having considered the facts and the evidence in the light most favorable to Plaintiffs, I find that the City has not met its summary judgment burden of establishing the absence of any genuine issue of material fact. The City has admitted that it has a policy for "courtesy tows." Plaintiffs have adduced sufficient evidence that the City was, in fact, responsible for the tows of their vehicles and that the City failed to provide any pre- or post-deprivation notice to the Plaintiffs. As such, I will deny the City's Motion in its entirety. An appropriate order follows.